# EXHIBIT B

## AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
## OF
## SPECTRUM ALLIANCE, LP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP dated as of January 1, 2006, by and among SPECTRUM ALLIANCE SERVICES GP, LLC, a Pennsylvania limited liability company, as general partner (the "General Partner"), and the PERSONS NAMED IN **EXHIBIT A** under the heading "Limited Partners," as limited partners (together with any other Person who becomes a limited partner in the Partnership as hereinafter provided, the "Limited Partners"). The General Partner and the Limited Partners are sometimes referred to individually as a "Partner" and collectively as the "Partners."

### BACKGROUND:

The Partnership was organized pursuant to an Agreement of Limited Partnership dated as of January 31, 2001 (as amended to date, the "Original Partnership Agreement"). The General Partner and the Limited Partners named in **Exhibit A**, being all of the Limited Partners, wish to amend and restate the Original Partnership Agreement in its entirety as set forth below.

### AGREEMENTS:

In consideration of the foregoing and the mutual promises herein contained, and intending to be legally bound, the parties agree as follows:

### ARTICLE I:    DEFINITIONS

Except as otherwise herein expressly provided, the following terms and phrases used in this Agreement and the Exhibits hereto shall have the meanings set forth below:

"Act" shall mean the Pennsylvania Revised Uniform Limited Partnership Act, as in effect at the time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Partner, the deficit balance, if any, in the Partner's Capital Account as of the end of any relevant Fiscal Year and after giving effect to the following adjustments:

(a) credit to such Capital Account any amounts that the Partner is obligated or treated as obligated to restore with respect to any deficit balance in such Capital Account pursuant to Section 1.704-1(b)(2)(ii)(c) of the Regulations, or is deemed to be obligated to restore with respect to any deficit balance pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(b) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the requirements of the alternate test for economic effect contained in Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" shall mean, with respect to any Partner (or as to any other Person the affiliates of whom are relevant for purposes of any of the provisions of this Agreement), (a) any member of the immediate family of the Partner; (b) any shareholder, director, officer, trustee, general partner, member, shareholder of a general partner or beneficiary of the Partner; (c) any legal representative, successor, or assignee of any Person referred to in the preceding clauses (a) and (b); (d) any trustee for the benefit of any Person referred to in the preceding clauses (a) through (c); or (e) any Entity that directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with any Person referred to in the preceding clauses (a) through (d).  Without limiting the generality of the foregoing, each of Robert T. Wrigley, William B. Fretz, Jr. and Richard A. Watson, Jr. and any Entity which any one or more of them Controls shall be deemed to be an Affiliate of the General Partner.

"Agreement" shall mean this Agreement of Limited Partnership, as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

"Annual Business Plan" shall mean the Partnership's annual business plan prepared by the General Partner and approved by the holders of the Class A Limited Partner Interests in accordance with Section 9.2.

"Bankruptcy" shall mean, with respect to any Partner, (a) the commencement by the Partner of any proceeding seeking relief under any provision or chapter of the federal Bankruptcy Code, 11 U.S.C. §101 et seq., as the same may be amended from time to time, or any other federal or state law relating to insolvency, bankruptcy or reorganization; (b) an adjudication that the Partner is insolvent or bankrupt; (c) the entry of an order for relief under the federal Bankruptcy Code with respect to the Partner; (d) the filing of any such petition or the commencement of any such case or proceeding against the Partner, unless the petition and the case or proceeding initiated thereby are stayed or dismissed within 90 days from the date of such filing; (e) the filing of an answer by the Partner admitting the allegations of any such petition; (f) the appointment of a trustee, receiver or custodian for all or substantially all of the assets of the Partner unless the appointment is stayed, vacated or dismissed within 90 days from the date of such appointment but not less than five days before the proposed sale of any assets of the Partner; (g) the insolvency of the Partner or the execution by the Partner of a general assignment for the benefit of creditors; (h) the convening by the Partner of a meeting of its creditors, or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; (i) the failure of the Partner to pay its debts as they mature; (j) the levy, attachment, execution or other seizure of substantially all of the assets of the Partner where the seizure is not discharged within 30 days thereafter; or (k) the admission by the Partner in writing of its inability generally to pay its debts as they mature or that it is generally not paying its debts as they become due.

-2-

"Capital Account" shall mean, with respect to any Partner, the separate "book" account that the Partnership shall establish and maintain for the Partner in accordance with Section 704(b) of the Code and Section 1.704-1(b)(2)(iv) of the Regulations and such other provisions of Section 1.704-1(b) of the Regulations that must be complied with in order for the Capital Accounts to be determined in accordance with the provisions of those Regulations. The Partnership shall also maintain a "Cash Capital Account" for each Class A Limited Partner which shall equal at any time the amount of cash and/or Contributed Assets contributed by such Class A Limited Partner minus the sum of all Net Capital Proceeds distributed to such Class A Limited Partner as a result of a Portfolio Sale.

"Capital Contribution" shall mean, with respect to any Partner, the amount of money and Contributed Assets contributed to the Partnership by the Partner (net of liabilities to which the Contributed Assets are subject).

"Certificate" shall mean the Certificate of Limited Partnership establishing the Partnership, as filed with the office of the Department of State of the Commonwealth of Pennsylvania, and as it may hereafter be amended from time to time in accordance with the terms of this Agreement and the Act.

"Class A Limited Partner" shall mean a Limited Partner holding a Class A Limited Partner Interest.

"Class A Limited Partner Interest" shall have the meaning given to that term in Section 3.1.

"Class A Percentage Interest" shall mean, with respect to any Class A Limited Partner, a percentage that the Class A Limited Partner's Class A Limited Partner Interest constitutes of all of the total outstanding Class A Limited Partner Interests of all Class A Limited Partners at the time. Each Class A Limited Partner's Class A Percentage Interest shall be determined from time to time by dividing the total number of Units held by such Class A Limited Partner by the total number of Units outstanding at that time and multiplying the quotient by 100.

"Class B Limited Partner" shall mean Spectrum Alliance Services CO, LLC, and any other Limited Partner holding a Class B Limited Partner Interest.

"Class B Limited Partner Interest" shall have the meaning given to that term in Section 3.1.

"Code" shall mean the Internal Revenue Code of 1986, as in effect at the time.

"Contributed Assets" shall mean, with respect to a Partner, the real property (including any Property), personal property, contract rights, contracts, agreements and other assets contributed by the Partner to the Partnership and shall include the assets set forth on

Exhibit A as being contributed to the Partnership on the date hereof as the initial capital contribution of the Partners named on Exhibit A.  The value of a Contributed Asset (for purposes of determining the contributing Partner's Capital Contribution with respect thereto) shall be as determined in accordance with subsection (i) of the definition of "Gross Asset Value."

"Control" shall mean the ability, whether by the direct or indirect ownership of shares or other equity interests, by contract or otherwise, to elect a majority of the directors of a corporation, to select the managing partner of a partnership, or otherwise to select, or have the power to remove and then select, a majority of those persons exercising governing authority over an Entity.  In the case of a limited partnership, the sole general partner, all of the general partners to the extent each has equal management control and authority, or the managing general partner or managing general partners thereof shall be deemed to have control of the limited partnership; in the case of a limited liability company, any manager thereof or any Person having the right to select any such manager shall be deemed to have control of the limited liability company; and, in the case of a trust, any trustee thereof or any Person having the right to select any such trustee shall be deemed to have control of the trust.

"Depreciation" shall mean, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for that Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of that Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to that beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to that asset for that Fiscal Year or other period bears to that beginning adjusted tax basis; provided further, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for that Fiscal Year or other period is zero, Depreciation shall be determined with reference to that beginning Gross Asset Value using any reasonable method selected by the General Partner; and provided further, however, that Depreciation with respect to any asset for which the "remedial allocation method" is used shall be computed in accordance with Section 1.704-3(d)(2) of the Regulations.

"Economic Capital Account" shall mean, with respect to any Partner, the balance in the Partner's Capital Account as of the end of any relevant period, increased by the Partner's share of Partnership Minimum Gain and Minimum Gain Attributable to Partner Nonrecourse Debt, and decreased by the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

"Encumbrance" shall mean any lien, security interest, mortgage, deed of trust, charge, claim, encumbrance, pledge, option, right of first offer or first refusal and any other right or interest of others of any kind or nature, actual or contingent, or other similar encumbrance of any nature whatsoever.

"Entity" shall mean any general partnership, limited partnership, corporation, joint venture, limited liability company, trust, business trust, cooperative or association.

"Event of Dissolution" shall have the meaning given to that term in Section 13.1.

"Event of Withdrawal" shall mean any event specified in Section 8532 of the Act or any corresponding provision of succeeding law.

"Taxable Year" shall have the meaning given to that term in Section 9.5.

"General Partner" shall mean Spectrum Alliance Services GP, LLC, a Pennsylvania limited liability company, in its capacity as general partner of the Partnership, its duly admitted successors and assigns and any other person who is a general partner of the Partnership at the time of reference thereto.

"General Partner Interest" shall mean the Partnership Interest of any General Partner.

"Gross Asset Value" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes except as follows:

(i)    the initial Gross Asset Value of any Contributed Asset shall be the gross fair market value of the asset at the time of the contribution, as determined in accordance with the Annual Business Plan then in effect;

(ii)    the Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times: (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis capital contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership; and (c) the liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; provided, however, that adjustments pursuant to clause (a), (b) or (c) of this sentence shall be made only if the General Partner reasonably determines that those adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership.

(iii)    the Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution, as determined by the General Partner.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i) or (ii) hereof, the Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to the asset for purposes of computing Net Income and Net Loss.

"Limited Partners" shall mean those Persons listed on **Exhibit A** under the heading "Limited Partners" in their respective capacities as limited partners of the Partnership,

their permitted successors or assigns as limited partners hereof, or any Person who, at the time of reference thereto, is a limited partner of the Partnership.

"Limited Partner Interest" shall mean any equity interest in the Partnership held by any person or Entity as a Limited Partner.  The Limited Partner Interests shall initially consist of Class A Limited Partner Interests and Class B Limited Partner Interests, as described in Section 3.1.

"Minimum Gain Attributable to Partner Nonrecourse Debt" shall mean "partner nonrecourse debt minimum gain" as determined in accordance with Section 1.704-2(i)(2) of the Regulations.

"Net Capital Proceeds" shall mean, with respect to any period, the sum of (1) Net Sale Proceeds and Net Financing Proceeds received by the Partnership during the period and (2) the amount of reserves previously established by the General Partner pursuant to the definition of "Net Sale Proceeds" or "Net Financing Proceeds" that the General Partner determines during the period to be in excess of necessary reserves for capital or operating expenditures.

"Net Equity Value" and "Net Equity Value of a Property" shall have the meanings set forth in Section 4.4.

"Net Financing Proceeds" shall mean the proceeds realized from any financing or refinancing of a Property, net of amounts used to repay indebtedness, to pay transaction costs and to fund reserves established by the General Partner and of any amounts reinvested by the General Partner in other Properties within six months of the applicable financing or refinancing.

"Net Income" or "Net Loss" shall mean, for each taxable year or other applicable period, an amount equal to the Partnership's net income or loss for that year or period as determined for federal income tax purposes and in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a) of the Code shall be included in taxable income or loss), with the following adjustments:  (a) including as an item of gross income any tax-exempt income received by the Partnership; (b) treating as a deductible expense any expenditure of the Partnership described in Section 705(a)(2)(B) of the Code (including amounts paid or incurred to organize the Partnership (unless an election is made pursuant to Code Section 709(b)) or to promote the sale of interests in the Partnership, and treating deductions for any losses incurred in connection with the sale or exchange of Partnership property disallowed pursuant to Section 267(a)(1) or Section 707(b) of the Code as expenditures described in Section 705(a)(2)(B) of the Code; (c) in lieu of depreciation, depletion, amortization, and other cost recovery deductions taken into account in computing total income or loss, there shall be taken into account Depreciation; (d) gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of such property rather than its adjusted tax basis; and (e) in the event of an adjustment of the Gross Asset Value of any Partnership asset which requires that the Capital Accounts of the Partnership be adjusted pursuant to Sections 1.704-1(b)(2)(iv)(e), (f)

and (m) of the Regulations, the amount of such adjustment shall be taken into account as additional Net Income or Net Loss pursuant to Article VII hereof.

"Net Operating Proceeds" shall mean, with respect to any period, the excess, if any, of:

(1) the sum of (A) all cash receipts of the Partnership during the period, other than receipts taken into account in determining Net Capital Proceeds and other than receipts from Capital Contributions, and (B) the amount of reserves previously established by the General Partner pursuant to paragraph (2) of this definition that the General Partner determines during the period to be in excess of necessary reserves for capital or operating expenditures, over

(2) the sum, without duplication, of (A) all cash expenses of the Partnership for the period, (B) the amount of all payments of principal and interest paid or due on account of any indebtedness of the Partnership during the period (other than, in the case of clauses (A) and (B), (i) cash expenses and payments of indebtedness taken into account in determining Net Capital Proceeds for the period, and (ii) cash expenses and payments made out of reserves previously established by the General Partner pursuant to clause (C) of this paragraph or pursuant to the definition of "Net Sale Proceeds" or "Net Financing Proceeds"), and (C) such cash reserves as the General Partner establishes during the period for any capital or operating expenditure permitted by this Agreement.

"Net Sale Proceeds" shall mean the proceeds realized from any sale of a Property, net of amounts used to repay indebtedness, to pay transaction costs and to fund reserves established by the General Partner and of any amounts reinvested by the General Partner in other Properties within six months of the applicable sale.

"Nonrecourse Deductions" shall have the meaning set forth in Sections 1.704-2(b)(1) and (c) of the Regulations.

"Nonrecourse Liabilities" shall have the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Partner Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(i)(2) of the Regulations.

"Partners" shall mean the General Partner and the Limited Partners, their duly admitted successors or assigns or any Person who is a partner of the Partnership at the time of reference thereto.

"Partnership" shall mean the limited partnership hereby constituted, as such limited partnership may from time to time be constituted.

"Partnership Minimum Gain" shall have the meaning set forth in Section 1.704-2(b)(2) of the Regulations.

"Partnership Interest" shall mean the entire ownership interest of a Partner in the Partnership at any particular time, including the right of the Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement and in the Act, together with the obligations of such Partner to comply with all of the terms and provisions of this Agreement and of the Act. The Partnership Interest shall be expressed, with respect to Class A Limited Partners, by the number of Units held by such Class A Limited Partner.

"Percentage Interest" shall mean, with respect to any Class A Limited Partner, a percentage that the Partner's Units constitutes of all of the total outstanding Units of all Class A Limited Partners, as shown on **Exhibit A** as then in effect. For each General Partner and Class B Limited Partner, such Partner's Percentage Interest shall mean its distribution interest in Net Capital Proceeds as shown on Exhibit A as then in effect.

"Person" shall mean any individual or Entity.

"Portfolio Sale" shall mean any sale, transfer or other conveyance (excluding leases to tenants in the ordinary course of the Partnership's business), whether in a single transaction or a series of transactions occurring in any period of twelve (12) consecutive months, of Properties constituting eighty percent (80%) or more of the Net Equity Value of the Partnership.

"Property" shall mean any real property in which the Partnership, directly or indirectly, acquires ownership of all or a portion of a fee or leasehold interest, and shall mean as of the date of this Agreement the real property identified in the initial Annual Business Plan attached as **Exhibit B**.

"Register" shall mean the register established pursuant to Section 3.3.

"Regulations" shall mean the final or temporary income tax regulations promulgated under the Code, as such regulations may be amended and in effect from time to time (including corresponding provisions of succeeding regulations).

"Reviewed Financial Statements" shall mean financial statements (balance sheet, statement of operations, statement of partners' equity and statement of cash flows) prepared in accordance with the accepted method accounting used for Federal income tax purposes and reviewed by independent auditors selected by the General Partner.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Tax Items" shall have the meaning given to that term in Section 7.3(a).

"Tax Matters Partner" shall have the meaning given to that term in Section 9.4.

-8-

"Tax Payment Loan" shall have the meaning given to that term in Section 6.4.

"Transfer" as a noun, shall mean any sale, assignment, conveyance, pledge, hypothecation, gift, encumbrance or other transfer, and as a verb, shall mean to sell, assign, convey, pledge, hypothecate, give, encumber or otherwise transfer.

"Unit" or "Units" shall have the meaning given to those terms in Section 4.4.

"Withholding Tax Act" shall have the meaning given to that term in Section 6.4.

## ARTICLE II:  FORMATION OF PARTNERSHIP

Section 2.1 Formation of Partnership.

The Partners hereby agree to form the Partnership as a limited partnership pursuant to the provisions of the Act for the purposes and upon the terms and conditions hereinafter set forth.  The Partners agree that the rights and liabilities of the Partners shall be as provided herein, except as otherwise expressly required by the Act or other applicable law, if any.

Section 2.2 Name, Principal Place of Business and Registered Office.

(a)  The business of the Partnership shall be conducted under the name of "SPECTRUM ALLIANCE, LP" or such other name as the General Partner may select, and all transactions of the Partnership and title to all of the Partnership's assets, to the extent permitted by applicable law, shall be carried on and completed in that name.

(b)  The principal place of business and registered office of the Partnership shall be located at 1690 Sumneytown Pike, Suite 190, Lansdale, Pennsylvania 19446.  The General Partner may change the principal place of business or the registered office of the Partnership at any time in its sole discretion, and, in such event, shall give written notice thereof to all Limited Partners and file any required amendments to the Certificate required by the Act.

Section 2.3 Purpose.

The purpose of the Partnership shall be, directly or indirectly, to acquire, hold, own, develop, redevelop, construct, improve, maintain, operate, manage, sell, lease, rent, transfer, encumber, mortgage, convey, exchange, and otherwise dispose of or deal with real and personal, tangible and intangible, property of every kind and nature, including, without limitation, office buildings and other commercial real estate, condominiums, shopping centers, hotels, recreational facilities and multifamily dwellings; to act as and exercise all of the powers of a general partner, limited partner or member, as the case may be, in partnerships, limited liability companies or joint ventures in which the Partnership has an interest; to acquire, own, deal with and dispose of securities and other interests in partnerships, limited liability companies, corporations, joint ventures and other associations, including those formed for the acquisition, development or redevelopment of real and personal property or the provision of services thereto; to undertake such other activities as may be necessary, advisable, desirable or convenient to the business of the Partnership; to engage in such other ancillary activities as shall be necessary or desirable to effectuate the foregoing purposes; and to otherwise engage in or conduct any enterprise, business or activity that a limited partnership may engage in or conduct under the Act.

Section 2.4 Powers.

-10-

The Partnership shall have and exercise all powers now or hereafter permitted by the Commonwealth of Pennsylvania to be exercised by a limited partnership formed under the laws of that Commonwealth.  In connection with (and without limiting) the foregoing, the Partnership shall have full power and authority, directly or through its interests in other partnerships, limited liability companies, corporations, joint ventures or other associations, to enter into, perform, and carry out contracts of any kind, to borrow and lend money and to issue evidences of indebtedness, whether or not secured by mortgages, trust deeds, pledges or other liens, and to guaranty, provide security for or cause any subsidiary, joint venture or other association in which the Partnership has an interest to guaranty or provide security for indebtedness or other obligations of the Partnership or any subsidiary.

### Section 2.5Term.

The Partnership shall commence existence upon the filing of the Certificate with the Department of State of the Commonwealth of Pennsylvania and shall continue until dissolved pursuant to law or this Agreement.

### Section 2.6Filing of Certificate and Amendments Thereto.

Promptly upon the execution and delivery hereof, the General Partner shall file or cause to be filed with the Department of State of the Commonwealth of Pennsylvania the Certificate, and shall make or file or cause to be made or filed such other elections, notices, instruments, documents or certificates (including amendments thereto and to the Certificate) as may be required by applicable law, including, without limitation, applications to do business in all jurisdictions where the Partnership will own property, and which may be necessary to enable the Partnership to conduct its business, and to own its properties, under the Partnership's name.

### Section 2.7Partnership Assets.

(a) The Partners shall use the Partnership's credit and assets solely for the benefit of the Partnership.  All real and personal property owned by the Partnership shall be owned by the Partnership, and the Partners as such shall have no direct interest therein.

(b) To the extent allowable under applicable law, title to all or any part of the properties of the Partnership may be held in the name of the Partnership or any other Person as nominee for the Partnership.  Any such title holder shall perform any and all of its respective functions to the extent and upon such terms and conditions as may be determined from time to time by the General Partner.

(c) No Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of its assets or properties or cause the sale of any Partnership property for other than a Partnership purpose, and notwithstanding any provision of applicable law to the contrary, each Partner (and its legal representatives, successors and assigns) hereby irrevocably waives any and all right to maintain any action for partition or to

compel any sale with respect to its Partnership Interest or with respect to any assets or properties of the Partnership, except as expressly provided in this Agreement.

Section 2.8 <u>Limitation on Liability of Persons Related to Partners.</u>

Except as otherwise required by applicable law or as expressly agreed in writing, no director, trustee, officer, shareholder, partner, member, employee or agent of any Partner shall be personally liable for the payment of any sums owing by such Partner to the Partnership or any other Partner under the terms of this Agreement or for the performance of any other covenant or agreement of such Partner contained herein.

Section 2.9 <u>Conflicts of Interest and Transactions with Affiliates.</u>

(a) Subject to the limitations expressly set forth herein, any Partner and any Affiliate of any Partner may engage in or possess an interest in any business, property or activity whatsoever, whether now existing or hereafter created, without any accountability to the Partnership or any Partner. This Agreement shall not give the Partnership or any Partner any interest in, or right to, any such business or activity or any proceeds, income or profit thereof or therefrom. No Partner shall be obligated to offer any business opportunity to the Partnership or any other Partner.

(b) Subject to the limitations expressly set forth herein, the Partnership may enter into any arrangement, contract, agreement or business venture that is not prohibited under the Act with any Partner or any Partner's Affiliates. Each Partner understands and acknowledges that the conduct of the business of the Partnership will involve business dealings with such other business ventures or undertakings of the Partners and their Affiliates. Without limiting the generality of the foregoing, the Partnership, at the discretion of the General Partner, may borrow funds from any Partner or any Partner's Affiliates and may enter into agreements with any Partner or any Partner's Affiliates to acquire or sell real estate and for brokerage services (e.g., regarding acquisitions, sales and leasing), property management services, construction related services and other services. Except to the extent otherwise provided herein, any material transaction between the Partnership and any Partner or Affiliate of a Partner shall be on terms reasonably determined by the General Partner to be no less favorable than the terms that could be obtained from unrelated third parties. Without limiting the generality of the foregoing, Schedule 2.9(b) sets forth the approximate fees for certain services to be provided to the Partnership by the General Partner and the General Partner's Affiliates. Such schedule may be amended from time to time by the General Partner.

## ARTICLE III:  PARTNERSHIP INTERESTS

Section 3.1 <u>In General.</u>

(a) The Partnership initially shall have three classes of Partnership Interest:  "General Partner Interests," "Class A Limited Partner Interests" and "Class B Limited

-12-

Partner Interests". The Partnership may create and issue additional classes of General or Limited Partner Interests in accordance with Section 3.2. No Partnership Interests shall be issued in certificated form.

(b) Any Person may at the same time hold more than one class of Partnership Interest and, in such event, shall for the purposes of this Agreement be separately entitled to the rights afforded a Partner in each of those classes under this Agreement. If a General Partner contributes to the capital of the Partnership as a Limited Partner or purchases any Limited Partner Interest, it shall be treated in all respects as a Limited Partner as to those Limited Partner Interests.

Section 3.2 Creation and Issuance of Additional Classes of Partnership Interests.

(a) Subject only to the limitations expressly set forth in this Agreement, the General Partner may from time to time solicit and accept additional Capital Contributions from any Person and/or cause the Partnership to create and issue such additional classes of Partnership Interests, rights, options, or warrants exercisable for or convertible into Partnership Interests, or other securities or instruments of any type or class whatsoever. Any such Partnership Interests, rights, options, warrants, securities or instruments may be issued for cash, property, services, or such other type, form, and amount of consideration (including notes, other evidences of indebtedness or obligations of the Person acquiring the interest, instrument or security, as the case may be) as the General Partner may determine to be appropriate. Each such class of additional Partnership Interest shall have such rights, privileges and preferences, and be subject to such limitations, as the General Partner shall specify.

(b) The creation of an additional class of Partnership Interest permitted hereunder may be made by the General Partner by setting forth either in an amendment or an addendum to this Agreement the relative rights, obligations, duties, and preferences of each new class of Partnership Interests created. A copy of this Agreement as so amended, or the addendum as so adopted, as the case may be, shall be provided to each other Partner. All filings necessary to be made under the Act or applicable law in connection with the creation of such interests shall be made by the General Partner on behalf of the Partnership.

(c) By executing this Agreement, each Partner consents and authorizes the Partnership, acting solely through the General Partner, to issue, subject to the express requirements and limitations hereof, such interests, instruments and securities upon such terms and conditions as the General Partner may from time to time determine to be appropriate.

Section 3.3 Register.

The General Partner shall maintain a Register at the principal place of business of the Partnership setting forth the names, addresses, Cash Capital Accounts of the Partners, and the number of Units and class of Partnership Interests held by each Partner. Upon any adjustment or cancellation of any Partner's Partnership Interest, the General Partner shall make such

-13-

adjustment or cancellation in the Register and send written notice thereof to the Partner so affected. Upon a transfer by a Partner of all or a part of its Partnership Interest in a manner that complies with the terms of this Agreement, the General Partner shall register the transfer in the Register. The General Partner shall note on the Register any restrictions on the transfer of any Partner's Partnership Interests and any such Partnership Interests that are held in escrow hereunder. In the absence of manifest error, the Register shall constitute conclusive evidence of the interest of each Partner and other Person in Partnership Interests.

## ARTICLE IV: CONTRIBUTIONS TO CAPITAL AND ISSUANCES OF PARTNERSHIP INTERESTS

Section 4.1 General Partner Capital Contributions. The General Partner has contributed, or caused to be contributed, as its initial Capital Contribution to the Partnership as General Partner the amount of cash and/or Contributed Assets set forth opposite its name on **Exhibit A**, and the Partnership has issued to and registered in the name of the General Partner on the Register the General Partner's Percentage Interest as set forth on **Exhibit A**.

Section 4.2 Limited Partner Capital Contributions. Each of the Persons identified on **Exhibit A** under the heading "Limited Partners" has contributed, or caused to be contributed, as its Capital Contribution to the Partnership, or has succeeded to the Capital Contribution of his, her or its predecessor in interest as a Limited Partner, the amount of cash and/or Contributed Assets set forth opposite the Limited Partner's name on **Exhibit A**, and the Partnership has issued to and registered in the name of the Limited Partner on the Register the Limited Partner's corresponding Percentage Interest and, as to the Class A Limited Partners, Units, calculated as provided herein, as set forth on **Exhibit A**.

Section 4.3 Capital Contributions Generally.

Except as otherwise expressly provided herein, or to the extent that a Partner agrees in writing in connection with making a Capital Contribution to, or purchasing Partnership Interests from, the Partnership: (i) a Partner shall not be required to contribute any capital to the Partnership; (ii) a Partner may not withdraw any of its capital from the Partnership; (iii) a Partner shall not be required to make any loan to the Partnership; (iv) loans by a Partner to the Partnership shall not be considered a contribution of capital, shall not increase the Capital Account of the lending Partner or the lending Partner's ownership interest in the Partnership and the repayment of such loans by the Partnership shall not decrease, or result in any adjustment to, the Capital Account of the Partner making the loans; (v) interest shall not be paid on any capital contributed to the Partnership by any Partner; (vi) under any circumstances requiring a return of all or any portion of a Capital Contribution, a Partner shall not have the right to receive property other than cash; and (vii) a Partner shall not be required at any time to restore any deficit in such Partner's Capital Account.

Section 4.4 Units. Each time a Class A Limited Partner makes a Capital Contribution, whether in the form of cash or Contributed Assets, to the Partnership, the

-14-

Partnership shall issue to such Class A Limited Partner the number of Units in the Partnership equivalent in value to such Capital Contribution, with the value of a Unit (determined as provided below) calculated each time a Unit or portion thereof is issued or redeemed.  There shall be no limit on the number of Units which the Partnership may issue.  The number of Units held by each Class A Limited Partners on the date hereof is listed on Exhibit A hereto.  Each Unit is an uncertificated ownership interest in the Partnership.

In determining the number of Units held by the Class A Limited Partners, and in determining the number of Units to be issued in connection with any subsequent Capital Contribution or the value of any Unit(s) in connection with any redemption, the Partnership will employ the following valuation methodology:

Each Property in the Partnership's portfolio will be valued by a licensed appraiser approximately once every other year, on a staggered basis, so as to incrementally refresh the portfolio valuation.  The appraiser will be charged with determining the fair market value of each Property.  The exact timing for appraising each Property will vary, with the Partnership attempting to spread the valuation of the Partnership's assets evenly over a 24-month period.  Certain projects may be appraised more frequently than once per year to the extent there are significant changes in the asset profile (i.e., development commences on a land parcel, in which case both an as-stabilized appraisal and a land appraisal may be used to interpolate a current value).  Also, to the extent there are major capital events (i.e., acquisitions/dispositions or financings), the timing of appraisals may be adjusted for efficiency (i.e., if Project X is scheduled to be appraised in February, but a refinancing is planned for July, the appraisal may be deferred until after the refinancing to eliminate unnecessary expenses and achieve fairer valuations).

As received, the appraised values will be inserted by the General Partner into a master spreadsheet to update the portfolio valuation.  That spreadsheet will include partnership-level accounting of assets and liabilities that would not be addressed on the Property level (the appraisals), and those non-property adjustments will be updated once per year (based on the receipt of the year-end financial statements from the Partnership's accountants).  The structure of the master spreadsheet has been shared with the Partnership's accountants, and will be reviewed periodically by those accountants and the Partnership's appraisal committee consisting of various principals of the General Partner or its Affiliates, third party accountants and other third party advisors.  The master spreadsheet shall reflect all mortgage debt and other monetary Encumbrances against each Property and the fair market value of a Property minus all Encumbrances against that Property shall be the "Net Equity Value of a Property".  The sum of all Net Equity Values of all of the Partnership's Properties, as adjusted for partnership-level accounting, shall be the "Net Equity Value" of the Partnership.

In order to establish the initial value of a Unit, the General Partner has assumed that one Unit on the date hereof is worth $100,000.  The General Partner has also caused the current Net Equity Value of the Partnership to be determined and has calculated, using prior Net Equity Values as of the date of each Capital Contribution, the current as-appreciated value of each Class A Limited Partner's Capital Account, has divided that value by $100,000, and the quotient represents the aggregate number of Units (calculated to four decimal places) being

-15-

issued to such Class A Limited Partner. The number of Units issued to a Class A Limited Partner will only change based on a redemption or a new Capital Contribution, but the value of a Unit may change each time there is a change in the Net Equity Value of the Partnership.

As an example, assume a Class A Limited Partner invested $500,000 at a time when that equated to five (5) Units (or $100,000 per Unit). Further assume that a subsequent investment of $500,000 was made on a date when the value of a Unit (based on the Net Equity Value of the Partnership) was $250,000. That subsequent Partner would receive two (2) Units for that Capital Contribution.

Section 4.5 No Third Party Beneficiary.

No creditor or other third party having dealings with the Partnership shall have the right to enforce the right or obligation of any Partner to make Capital Contributions or loans or to pursue any other right or remedy hereunder at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the parties hereto and their respective successors and assigns. None of the rights or obligations of the Partners to make Capital Contributions or loans to the Partnership shall be deemed an asset of the Partnership for any purpose by any creditor or other third party, nor may such rights or obligations be sold, transferred or assigned by the Partnership or pledged or encumbered by the Partnership to secure any debt or other obligation of the Partnership or of any of the Partners.

ARTICLE V:  CAPITAL ACCOUNTS

Section 5.1 Establishment and Maintenance of Capital Accounts

(a) A Capital Account shall be established for each Partner in the amount of the Partner's initial Capital Contribution to the Partnership. Unless otherwise provided in this Agreement, each Partner's Capital Account shall be determined and maintained in accordance with the rules of Section 1.704-1(b)(2)(iv) of the Regulations (or any corresponding provision of succeeding law), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with such Regulations. If the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with the Regulations, the General Partner shall make those modifications.

(b) Subject to the foregoing accounting rules, a Partner's Capital Account shall be increased, decreased, adjusted, and maintained as provided in Article VII. Changes in a Partner's Capital Account shall not affect a Partner's Cash Capital Account.

Section 5.2 <u>Succession to Capital Accounts</u>.

Subject to Section 11.6, in the event of a transfer of any Partnership Interest permitted herein, the Capital Account of the transferor Partner that is attributable to the transferred Partnership Interest shall be carried over to the transferee of the interest and adjusted as provided in the Regulations under Code section 704.

Section 5.3 <u>Certain Adjustments</u>.

In connection with any Capital Contribution to the Partnership in consideration for a Partnership Interest, or a distribution by the Partnership to a Partner in respect of a Partnership Interest, the General Partner shall increase or decrease the Capital Accounts to reflect a revaluation of Partnership property as provided in Section 1.704-1(b)(2)(iv)(f) of the Regulations.

## ARTICLE VI: DISTRIBUTIONS

Section 6.1 <u>Distributions of Net Operating Proceeds and Net Capital Proceeds</u>.  For each quarter of each taxable year of the Partnership, Net Operating Proceeds and Net Capital Proceeds shall be distributed in the following order of priority:

(a) Net Operating Proceeds shall be distributed to the Class A Limited Partners pro rata in accordance with their respective Percentage Interests.

(b) Net Capital Proceeds shall, subject to the final sentence of this subsection 6.1(b), be distributed 87.5% to the holders of the Class A Limited Partner Interests (<u>pro</u> rata in accordance with their respective holdings of Class A Limited Partner Interests), 11.50% to the holders of the Class B Limited Partner Interests (<u>pro</u> rata in accordance with their respective holdings of Class B Limited Partner Interests) and 1% to the General Partner. Notwithstanding the foregoing, in the event of a Portfolio Sale, Net Capital Proceeds shall first be distributed to the Class A Limited Partners to the extent of their respective Cash Capital Accounts, and thereafter as provided in the first sentence of this subsection 6.1(b).

Section 6.2 <u>Distributions upon Liquidation</u>.

Liquidating distributions shall in all cases be made in accordance with the provisions of Section 13.5.

Section 6.3 <u>Additional Distribution Rules</u>.

(a) <u>Effective Date</u>.  Distributions shall be charged against the Partners' Capital Accounts as of the date the distributions are made.

-17-

(b) <u>Division Among Limited Partners</u>.  Except as may otherwise be provided herein or in the instruments creating a class of Partnership Interests, each distribution made to the Limited Partners of a given class pursuant to this Article VI shall be divided among the Limited Partners of that class so that each of them shall receive the same proportion of the distribution as the Limited Partner Interests of the class owned by each Limited Partner bear to all Limited Partner Interests of the same class then owned by all Limited Partners.

(c) <u>Obligation to Repay Distribution</u>.  In the absence of fraud or mistake, or except as otherwise required by law, no Partner shall have any obligation or responsibility to repay to the Partnership any distribution made by the Partnership to a Partner pursuant to this Agreement.

(d) <u>Legal Requirements</u>.  Notwithstanding anything contained herein to the contrary, the General Partner may withhold making a distribution to any Limited Partner, or to any transferee of a Limited Partner, until the Limited Partner or the transferee has provided the General Partner with all necessary information and assurances, including an opinion of counsel satisfactory to the General Partner requested by the General Partner, to determine that such distribution will be in compliance with all applicable laws.

Section 6.4<u>Taxes Withheld</u>.

Unless treated as a Tax Payment Loan (as hereinafter defined), any amount paid by the Partnership for or with respect to any Partner on account of any withholding tax or other tax payable with respect to the income, profits or distributions of the Partnership pursuant to the Code, the Regulations, or any state or local statute, regulation or ordinance requiring the payment (a "Withholding Tax Act") shall be treated as a distribution to the Partner for all purposes of this Agreement, consistent with the character or source of the income, profits or cash that gave rise to the payment or withholding obligation.  To the extent that the amount required to be remitted by the Partnership under a Withholding Tax Act exceeds the amount then otherwise distributable to such Partner, the excess shall constitute a loan from the Partnership to the Partner (a "Tax Payment Loan") which shall be payable upon demand and shall bear interest, from the date that the Partnership makes the payment to the relevant taxing authority, at the federal tax underpayment rate, under section 6621(a)(2) of the Code, as reported from time to time.  So long as any Tax Payment Loan or the interest thereon remains unpaid, the Partnership shall make future distributions due to the Partner under this Agreement by applying the amount of any such distribution first to the payment of any unpaid interest on all Tax Payment Loans of the Partner and then to the repayment of the principal of all Tax Payment Loans of the Partner.  The General Partner shall have the authority to take all actions necessary to enable the Partnership to comply with the provisions of any Withholding Tax Act applicable to the Partnership and to carry out the provisions of this Section.  Nothing in this Section shall create any obligation on the General Partner to advance funds to the Partnership or to borrow funds from third parties in order to make any payments on account of any liability of the Partnership under a Withholding Tax Act.

-18-

Section 6.5 <u>In-Kind Distributions</u>.

If, at the discretion of the General Partner, any assets of the Partnership other than cash are distributed to the Partners in kind, those assets shall be valued on the basis of the fair market value thereof as determined by the General Partner in its reasonable discretion on the date of distribution. Without limiting the General Partner's discretion to make such a valuation or requiring that any such appraisal be made, the valuation of any asset by the General Partner on the basis of the determination of its fair market value by an independent appraiser shall be deemed to be a reasonable value for the asset and a reasonable exercise of such discretion. If any Partnership property other than cash is distributed to a Partner, the Capital Accounts of the Partners shall be adjusted to reflect the manner in which the unrealized income, gain, loss or deduction inherent in the property (that has not previously been reflected in the Partners' Capital Accounts) would be allocated among the Partners if there had been a taxable disposition of the property at its fair market value on the date of distribution. The Capital Accounts of the Partner receiving a distribution in kind shall then be reduced by the fair market value of the property distributed. Subject to the limitations on such distributions in connection with any distribution of property of the Partnership in kind, including any distribution in connection with the liquidation of the Partnership, the General Partner need not distribute each asset ratably to all Partners, so long as all Partners concurrently receive distributions of cash and other property, valued as provided above, in the proportion to which they would otherwise be entitled.

## ARTICLE VII: ALLOCATIONS

Section 7.1 <u>Allocation of Net Income and Net Loss</u>.

Net Income and Net Loss shall, except as otherwise provided herein, be allocated in each taxable year of the Partnership as follows:

(a) <u>Allocation of Net Income</u>. Net Income shall be allocated:

(i)    first, to the Partners in proportion to their deficit Capital Account balances, if any, until such deficit balances have been eliminated;

(ii)    next, in the case of Net Income resulting from Net Operating Proceeds, 100% to the Class A Limited Partners pro rata in accordance with their respective Class A Percentage Interests;

(iii)    next, in the case of Net Income resulting from Net Capital Proceeds other than in a Portfolio Sale, 87.5% to the holders of the Class A Limited Partner Interests (pro rata in accordance with their respective holdings of Class A Limited Partner Interests), 11.50% to the holders of the Class B Limited Partner Interests (pro rata in accordance with their respective holdings of Class B Limited Partner Interests) and 1% to the General Partner; and

-19-

(iv)        next, in the case of Net Income resulting from Net Capital Proceeds in a Portfolio Sale, among the Partners in such manner as to cause each Partner's Capital Account balance to equal, to the extent possible, the amount distributable to such Partner pursuant to Section 6.1(b); and

(v)        the balance of Net Income, if any, shall be allocated 87.5% to the holders of the Class A Limited Partner Interests (pro rata in accordance with their respective holdings of Class A Limited Partner Interests), 11.50% to the holders of the Class B Limited Partner Interests (pro rata in accordance with their respective holdings of Class B Limited Partner Interests) and 1% to the General Partner.

(b) Allocation of Net Loss.  Net Loss shall be allocated:

(i)        first, among the Partners in such manner as to cause each Partner's Capital Account balance to equal, to the extent possible, the amount that would be distributable to such Partner pursuant to Section 6.1 in the event of a Portfolio Sale;

(ii)        next, to the Class B Limited Partners and the General Partner, in proportion to their respective Percentage Interests until their Capital Account balances equal zero; and

(iii)        the balance of Net Loss, if any, shall be allocated 100% to the Class A Limited Partners pro rata in proportion to their respective Class A Percentage Interests.

(iv)

Section 7.2 Special Allocations.

Notwithstanding anything to the contrary contained in this Agreement:

(a) Minimum Gain Chargeback (Nonrecourse Liabilities).  If there is a net decrease in Partnership Minimum Gain for any Partnership taxable year (except as a result of conversion or refinancing of Partnership indebtedness, certain capital contributions or revaluation of the Partnership property as further outlined in Sections 1.704-2(d)(4), (f)(2) or (f)(3) of the Regulations), each Partner shall be specially allocated items of Partnership income and gain for each year (and, if necessary, subsequent years) in an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain.  The items to be so allocated shall be determined in accordance with Section 1.704-2(f) of the Regulations.  This paragraph (a) is intended to comply with the minimum gain chargeback requirement in that section of the Regulations and shall be interpreted consistently therewith.  Allocations pursuant to this paragraph (a) shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant hereto.

(b) Minimum Gain Attributable to Partner Nonrecourse Debt.  If there is a net decrease in Minimum Gain Attributable to Partner Nonrecourse Debt during any taxable year (other than due to the conversion, refinancing or other change in the debt instrument causing it to

-20-

become partially or wholly nonrecourse, certain capital contributions, or certain revaluations of Partnership property as further outlined in Section 1.704-2(i)(4) of the Regulations), each Partner shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount equal to that Partner's share of the net decrease in the Minimum Gain Attributable to Partner Nonrecourse Debt. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and (j)(2) of the Regulations. This paragraph (b) is intended to comply with the minimum gain chargeback requirement with respect to Partner Nonrecourse Debt contained in those sections of the Regulations and shall be interpreted consistently therewith. Allocations pursuant to this paragraph (b) shall be made in proportions to the respective amounts required to be allocated to each Partner pursuant hereto.

(c) <u>Qualified Income Offset</u>. In the event a Partner receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, and the Partner has an Adjusted Capital Account Deficit, items of Partnership income and gain shall be specially allocated to the Partner in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit as quickly as possible. This paragraph (c) is intended, among other things, to meet the requirements for a "qualified income offset" under Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(d) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any taxable year or other applicable period shall be allocated to the Partners in accordance with their respective Percentage Interests.

(e) <u>Partner Nonrecourse Deductions</u>. Partner Nonrecourse Deductions for any taxable year or other applicable period shall be specially allocated to the Partner that bears the economic risk of loss for the debt (i.e., the Partner Nonrecourse Debt) in respect of which such Partner Nonrecourse Deductions are attributable (as determined under Sections 1.704-2(b)(4) and (i)(1) of the Regulations).

(f) <u>Limitation on Allocation of Losses</u>. To the extent, if any, that an allocation of Net Loss to a Partner would cause the Partner to have an Adjusted Capital Account Deficit, such Net Loss shall instead be allocated to the extent possible among Partners with positive Economic Capital Account balances in proportion to those positive balances.

Section 7.3<u>Tax Allocations</u>.

(a) <u>Generally</u>. Subject to paragraphs (b) and (c) hereof, items of income, gain, loss, deduction and credit to be allocated for income tax purposes (collectively, "Tax Items") shall be allocated among the Partners on the same basis as their respective book items.

(b) <u>Sections 1245/1250 Recapture</u>. If any portion of gain from the sale of property is treated as gain which is ordinary income by virtue of the application of Code Sections 1245 or 1250 ("Affected Gain"), then (i) the Affected Gain shall be allocated among the Partners in the same proportion that the depreciation and amortization deductions giving rise to the Affected Gain were allocated and (ii) other Tax Items of gain of the same character that would

-21-

have been recognized, but for the application of Code Sections 1245 and/or 1250, shall be allocated away from those Partners who are allocated Affected Gain pursuant to clause (i) so that, to the extent possible, the other Partners are allocated the same amount, and type, of capital gain that would have been allocated to them had Code Sections 1245 and/or 1250 not applied. For purposes hereof, in order to determine the proportionate allocations of depreciation and amortization deductions for each taxable year or other applicable period, such deductions shall be deemed allocated on the same basis as Net Income and Net Loss for the respective period.

(c)  <u>Allocations Respecting Section 704(c) and Revaluations.</u> Notwithstanding paragraph (b) hereof, Tax Items with respect to Partnership property that is subject to Code Section 704(c) and/or Section 1.704-1(b)(2)(iv)(f) of the Regulations shall be allocated in accordance with that Code section and/or Section 1.704-1(b)(4)(i) of the Regulations, as the case may be.  The Partnership shall apply the "traditional method" for such allocations, as described in Section 1.704-3(b) of the Regulations, and the allocation of Tax Items shall be subject to the ceiling rule stated in Section 1.704-3(b)(1) of the Regulations.

Section 7.4  <u>Election of Liquidation Value Safe Harbor.</u>

Each Partner, by executing this Agreement, hereby agrees to the following:

(a)  The Partnership is authorized and directed to elect the safe harbor, in accordance with proposed Section 1.83-3(l) of the Regulations and the proposed revenue procedure thereunder (once such regulations and revenue procedure become effective), under which the fair market value of each interest in the Partnership that is transferred in connection with the performance of services shall be treated as being equal to the liquidation value of that interest (the "Safe Harbor Election");

(b)  The Partnership and each Partner (including any person to whom an interest in the Partnership is transferred in connection with the performance of services) agree to comply with all requirements of the Safe Harbor Election with respect to all interests in the Partnership transferred in connection with the performance of services while the Safe Harbor Election remains effective, including the requirement that all relevant Federal income tax items be reported consistently with the Safe Harbor Election;

(c)  The effective date of the Safe Harbor Election shall be the earliest permitted such date under the applicable regulations and revenue procedure, once those become effective, and the Safe Harbor Election shall continue to apply until such time (if ever) as all Partners affected by the Safe Harbor Election shall agree to terminate it and the Partnership shall affirmatively terminate it under applicable procedures;

(d)  The Tax Matters Partner shall file, with the Partnership's Federal income tax return for the taxable year in which the Safe Harbor Election becomes effective, a document, executed by the Tax Matters Partner, stating that the Partnership is electing, on behalf of the Partnership and the Partners, to have the Safe Harbor Election apply irrevocably with

-22-

respect to all interests in the Partnership transferred in connection with the performance of services while the Safe Harbor Election is in effect; and

(e)    The Partnership shall comply with applicable recordkeeping requirements for the Safe Harbor Election, and the Partnership and the Partners shall take all other actions, if any, required to comply with the requirements of such Safe Harbor Election as ultimately promulgated, to the extent practicable.

## ARTICLE VIII: EXPENSES; POWERS OF THE GENERAL PARTNER; MEETINGS.

### Section 8.1 Expenses Borne by the Partnership.

All expenses of the Partnership (including, without limitation, premiums for General Partner's liability and partnership reimbursement insurance policies) shall be billed directly to and paid by the Partnership. The General Partner may charge to the Partnership and/or pay out of Partnership funds, as and when available, all reasonable expenses incurred by the General Partner and/or its Affiliates in the operation of the Partnership, including, but not limited to, expenses, charges and fees contemplated by the Annual Business Plan and those relating to (i) organization expenses (including, without limitation, the cost of preparing this Agreement and related documents), (ii) attorneys' fees and expenses and court costs, (iii) the fees and expenses of outside consultants and other professionals engaged in connection with the preparation and maintenance of the books and records, financial statements and tax returns of the Partnership and to assist in evaluating investment opportunities and in monitoring investments made by the Partnership, (iv) reasonable compensation paid to the General Partner and/or its affiliates for time spent and services performed by in-house attorneys and other professional employees directly relating to Partnership business to the extent those amounts would have otherwise been paid to third party attorneys and other professionals, and (v) offering expenses relating to the issuance by the Partnership of Limited Partner Interests from existing classes and additional classes (including, without limitation, the cost of preparing offering materials and related documents).

### Section 8.2 Powers and Duties of General Partner.

The General Partner shall be responsible for the management of the Partnership's business and affairs. Except as otherwise herein expressly provided, and subject to the limitations contained in Section 8.3, the General Partner shall have, and is hereby granted, full and complete power, authority and discretion to take any action for and on behalf of the Partnership as the General Partner shall, in its sole and absolute discretion, deem necessary or appropriate to carry out the purposes for which the Partnership was organized. Except as otherwise expressly provided herein, and subject to Section 8.3, the General Partner shall exercise all of the powers of the Partnership and have specifically, without limiting the foregoing, the right, power and authority:

(a) to manage, control, invest, reinvest, acquire by purchase, lease or otherwise, sell, contract to purchase or sell, grant, obtain, or exercise options to purchase, options to sell or conversion rights, assign, transfer, convey, deliver, endorse, exchange, pledge, mortgage, abandon, improve, repair, maintain, insure, lease for any term and otherwise deal with any and all property of whatsoever kind and nature, and wheresoever situated, in furtherance of the business or purposes of the Partnership;

(b) to acquire, directly or indirectly, interests in real estate of any kind and of any type, and any and all kinds of interests therein and interests in Entities investing therein, and to determine the manner in which title thereto is to be held; to manage (directly or through property managers), insure against loss, protect and subdivide any of the real estate, interests therein or parts thereof; to improve, develop or redevelop any such real estate; to participate in the ownership and development of any property; to dedicate for public use, to vacate any subdivisions or parts thereof, to re-subdivide, to contract to sell, to grant options to purchase or lease, to sell on any terms; to convey, to mortgage, pledge or otherwise encumber any property, or any part thereof; to lease any property or any part thereof from time to time, upon any terms and for any period of time, and to renew or extend leases, to amend, change or modify the terms and provisions of any leases and to grant options to lease and options to renew leases and options to purchase; to partition or to exchange any real property, or any part thereof, for other real or personal property; to collect all rental and other income accruing to the Partnership; to grant easements or charges of any kind; to release, convey or assign any right, title or interest in or about or easement appurtenant to any property or any part thereof; to construct and reconstruct, remodel, alter, repair, add to or take from buildings; to insure any Person having an interest in or responsibility for the care, management or repair of any property; to direct the trustee of any land trust to mortgage, lease, convey or contract to convey the real estate held in the land trust or to execute and deliver deeds, mortgages, notes, and any and all documents pertaining to the property subject to the land trust or in any matter regarding the land trust, and to execute assignments of all or any part of the beneficial interest in the land trust;

(c) to employ, engage or contract with or dismiss from employment or engagement Persons to the extent deemed necessary or appropriate by the General Partner for the operation and management of the Partnership business, including but not limited to, contractors, subcontractors, engineers, architects, surveyors, mechanics, consultants, accountants, attorneys, insurance brokers, real estate brokers and others;

(d) to enter into, make, amend, perform and carry out or cancel and rescind, contracts and other obligations on behalf of the Partnership (including contracts between the Partnership and Partners and/or their Affiliates as described in Section 2.9(b)) and to cause all Partnership expenses to be paid;

(e) to borrow money, procure loans and advances from any Person for Partnership purposes, and to apply for and secure, from any Person, credit or accommodations; to contract liabilities and obligations, direct or contingent and of every kind and nature (including interest rate swaps, caps and hedges) with or without security; and to repay, discharge, settle, adjust, compromise, or liquidate any such loan, advance, credit, obligation or liability;

-24-

(f) to pledge, hypothecate, mortgage, assign, deposit, deliver, enter into sale and leaseback arrangements or otherwise give as security or as additional or substitute security, or for sale or other disposition any and all Partnership property, tangible or intangible, including, but not limited to, real estate and beneficial interests in land trusts, and to make substitutions thereof, and to receive any proceeds thereof upon the release or surrender thereof; to sign, execute and deliver any and all assignments, deeds and other contracts and instruments in writing; to authorize, give, make, procure, accept and receive moneys, payments, property, notices, demands, vouchers, receipts, releases, compromises and adjustments; to waive notices, demands and protests and authorize and execute waivers of every kind and nature; to enter into, make, execute, deliver and receive written agreements, undertakings and instruments of every kind and nature; to give oral instructions and make oral agreements; and generally to do any and all other acts and things incidental to any of the foregoing or with reference to any dealings or transactions which the General Partner may deem necessary, proper or advisable to effect or accomplish any of the foregoing or to carry out the business and purposes of the Partnership;

(g) to sell or otherwise dispose of any or all assets of the Partnership;

(h) to acquire and enter into any contract of insurance which the General Partner deems necessary or appropriate for the protection of the Partnership, for the conservation of the Partnership's assets or for any purpose convenient or beneficial to the Partnership and to settle claims under such insurance;

(i) to conduct any and all banking transactions on behalf of the Partnership; to adjust and settle checking, savings and other accounts with such institutions as the General Partner shall deem appropriate; to draw, sign, execute, accept, endorse, guarantee, deliver, receive and pay any checks, drafts, bills of exchange, acceptances, notes, obligations, undertakings and other instruments for or relating to the payment of money in, into or from any account in the Partnership's name; to execute, procure, consent to and authorize extensions and renewals of the same; to make deposits and withdraw the same and to negotiate or discount commercial paper, acceptances, negotiable instruments, bills of exchange and dollar drafts; to pay all taxes, assessments, rents and other impositions applicable to the assets of the Partnership and to seek to reduce the same; to invest all monies of the Partnership;

(j) to demand, sue for, receive and otherwise take steps to collect or recover all debts, rents, proceeds, interests, dividends, goods, chattels, income from property, damages and all other property, to which the Partnership may be entitled or which are or may become due the Partnership from any Person; to commence, prosecute or enforce, or to defend, answer or oppose, contest and abandon all legal proceedings in which the Partnership is or may hereafter be interested; and to settle, compromise or submit to arbitration any accounts, debts, claims, disputes and matters that may arise between the Partnership and any other Person and to grant an extension of time for the payment or satisfaction thereof on any terms, with or without security;

(k) to confess judgment against the Partnership;

-25-

(l)  to make arrangements for financing, including the taking of all action deemed necessary or appropriate by the General Partner to cause any approved loans to be closed including, without limitation, the execution and delivery on behalf of the Partnership of notes, mortgages, deeds of trust and like instruments;

(m) to make arrangements for, conduct and otherwise take all action deemed necessary or appropriate by the General Partner in connection with private placements of Limited Partner Interests from existing classes and additional classes, including entering into agreements with placement agents;

(n)  to take all reasonable measures necessary to insure compliance by the Partnership with applicable arrangements and other contractual obligations entered into by the Partnership from time to time in accordance with the provisions of this Agreement, including periodic reports as required to be submitted to lenders, and using all due diligence to insure that the Partnership is in compliance with its contractual obligations;

(o)  to maintain the Partnership's books and records;

(p)  to prepare and deliver, or cause to be prepared and delivered by the Partnership's accountants, all financial and other reports with respect to the operations of the Partnership, and all federal and state tax returns and reports;

(q)  to act in any state or nation in which the Partnership may lawfully act, for itself or as principal, agent or representative for any Person, including the Partnership, with respect to any business of the Partnership;

(r)  to become a partner or member in, and perform the obligations of a partner or member of, any general or limited partnership or limited liability company;

(s)  to apply for, register, obtain, purchase or otherwise acquire trademarks, trade names, labels and designs relating to or useful in connection with any business of the Partnership, and to use, exercise, develop and license the use of the same;

(t)  to pay or reimburse any and all actual fees, costs and expenses incurred in the formation and organization of the Partnership and in connection with the issuance by the Partnership of Limited Partner Interests from existing classes and additional classes (including, without limitation, the cost of preparing offering materials and related documents);

(u)  to do all acts which are necessary, customary or appropriate for the protection and preservation of the Partnership's assets, including the establishment of reserves;

(v)  to exercise all rights, and to perform all duties, responsibilities and obligations, granted to or required of the General Partner by this Agreement; and

-26-

(w) in general, to exercise all of the general rights, privileges and powers permitted to be had and exercised by general partners under the Act.

Section 8.3 Proscriptions.

The General Partner shall not have the authority to:

(a) do any act in contravention of this Agreement or that would make it impossible to carry on the ordinary business of the Partnership;

(b) possess any Partnership property or assign rights in specific Partnership property for other than Partnership purposes;

(c) do any act in contravention of applicable law;

(d) without the consent of the holders of at least 75% of the then outstanding Class A Percentage Interests, cause the Partnership to make a general assignment for the benefit of creditors, or appoint or acquiesce in the appointment of a custodian, receiver or trustee for all or any part of the Partnership's assets, or commence any proceeding seeking relief for the Partnership under any provision of the federal Bankruptcy Code 11 U.S.C. §101 et seq. or any other federal or state law relating to insolvency, bankruptcy or reorganization;

(e) without the consent of the holders of at least 75% of the then outstanding Class A Percentage Interests, take any action that is inconsistent with the Annual Business Plan then in effect; or

(f) without the consent of the holders of at least 75% of the then outstanding Class A Percentage Interests, create any additional class of Limited Partner Interest unless the same ranks junior to the Class A Limited Partner Interests as to distributions, allocations and voting rights.

Section 8.4 Additional Partners.

Additional Partners may be admitted to the Partnership only as provided in Article XII hereof.

Section 8.5 Compensation of the General Partner.

The General Partner shall not be entitled to any compensation for services rendered to the Partnership solely in its capacity as General Partner except as set forth on Schedule 2.9(b) and as provided in Section 8.1.

Section 8.6 <u>Waiver and Indemnification</u>.

(a) Neither the General Partner nor any Person acting on its behalf, pursuant hereto, shall be liable, responsible or accountable in damages or otherwise to the Partnership or to any Partner for any acts or omissions performed or omitted to be performed by it within the scope of the authority conferred upon the General Partner by this Agreement and the Act, so long as the General Partner or such other Person shall not be guilty of recklessness or willful misconduct.

(b) The Partnership shall, and hereby does, indemnify and hold harmless the General Partner and its Affiliates and any individual acting on their behalf from any loss, cost or expense, damage, claim or liability, including, but not limited to, reasonable attorneys' fees and expenses, incurred by them by reason of any act performed by them for or on behalf of the Partnership or the General Partner, or omitted to be performed by them, in accordance with the standards set forth above or in enforcing the provisions of this indemnity. No Partner or any of its Affiliates shall have any personal liability with respect to indemnification under this paragraph (b), and any such indemnification shall be satisfied solely out of the assets of the Partnership.

(c) All rights of any indemnitee hereunder shall survive the dissolution of the Partnership, but only if a claim for indemnification under this Agreement is made by or on behalf of the Person seeking indemnification prior to the time the Partnership is liquidated. The indemnification rights contained in this Agreement shall be cumulative of, and in addition to, any and all other rights, remedies and recourse to which the person seeking indemnification shall be entitled, whether at law or at equity.

Section 8.7 <u>Reliance by Third Parties</u>.

(a) Notwithstanding anything to the contrary in this Agreement, any Person dealing with the Partnership shall be entitled to assume that the General Partner has full power and authority to encumber, sell or otherwise use in any manner any and all assets of the Partnership and to enter into any contracts on behalf of the Partnership, and such Person shall be entitled to deal with the General Partner as if it were the Partnership's sole party in interest, both legally and beneficially.

(b) Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any Person dealing with the Partnership to contest, negate or disaffirm any action of the General Partner in connection with any such dealing. In no event shall any Person dealing with the General Partner or its representatives be obligated to ascertain that the terms of this Agreement have been complied with or to inquire into the necessity or expedience of any act or action of the General Partner or its representatives. Each and every certificate, document or other instrument executed on behalf of the Partnership by the General Partner shall be conclusive evidence in favor of any and every person relying thereon or claiming thereunder that (i) at the time of the execution and delivery of the certificate, document or instrument, this Agreement was in full force and effect, (ii) the Person executing and delivering

-28-

the certificate, document or instrument was duly authorized and empowered to do so for and on behalf of the Partnership, and (iii) the certificate, document or instrument was duly executed and delivered in accordance with the terms and provisions of this Agreement and is binding upon the Partnership.

Section 8.8 Other Matters Concerning the General Partner.

(a) The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report or other document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b) The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the opinion of such a Person as to matters that the General Partner reasonably believes to be within the Person's professional expertise shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.

(c) The General Partner shall have the right, in respect of any of its powers or obligations hereunder, to act through any of its duly authorized officers and any attorney or attorneys-in-fact duly appointed by the General Partner. Any Person dealing with the Partnership shall be entitled to rely on any certificate, document or other instrument executed on behalf of the Partnership by a duly authorized officer or by a duly authorized attorney or attorneys-in-fact of the General Partner. Each attorney-in-fact shall, to the extent provided by the General Partner in the power of attorney, have full power and authority to do and perform all and every act and duty that is permitted or required to be done by the General Partner hereunder.

Section 8.9 Meetings of Partners.

(a) Meetings of Partners may be called at any time by the General Partner to consider, and shall be so called so that the Partners may act on, any matter on which they are entitled to act under the terms of this Agreement or the Act. In addition, the General Partner shall call a meeting of Class A Limited Partners when directed to do so by holders of not less than 25% of the Class A Percentage Interests. Such direction shall be given by delivering to the General Partner a request in writing stating that such holders desire to call a meeting and indicating the general or specific purpose for which the meeting is to be called.

(b) The General Partner may fix a date not more than 60 nor less than five days preceding the date of any meeting of Partners, or preceding the last day on which the consent of Partners may be effectively expressed for any purpose without a meeting, as a record date for the determination of the Partners entitled to notice of, and to vote at, the meeting or to express consent. In either case, only those Partners who are Partners of record on the record date shall be entitled to notice of, and to vote at, the meeting and any adjournment thereof, or to

-29-

express consent, as the case may be, notwithstanding any transfer of any Partnership Interest on the Register after the record date.

(c) Notice of any meeting at which Partners are entitled to vote shall be given to each Partner of record not less than five nor more than 60 days prior to the date of the meeting. Each notice shall include a statement setting forth (i) the date, time and place of the meeting, (ii) a description of the matter on which the Partners are entitled to vote, and (iii) instructions for the delivery of proxies.

(d) Except as otherwise provided by law, at any meeting of Partners, the holders of a majority of the Percentage Interests entitled to vote at the meeting shall constitute a quorum at the meeting. In the absence of a quorum, the holders of a majority of the Percentage Interests entitled to vote thereat present in person or by proxy may adjourn the meeting, from time to time, until a quorum shall be present. At any such adjourned meeting at which a quorum shall be present, any business may be transacted that might have been transacted at the meeting as originally called.

(e) Each Partner entitled to vote at a meeting or to express consent to Partnership action in writing without a meeting may authorize another person or persons to act for him by proxy. A proxy acting for any Partner shall be duly appointed by an instrument in writing subscribed by such Partner and reasonably acceptable in form and substance to the General Partner. Except as otherwise provided by law, no vote on any question upon which a vote of the Partners may be taken need be by ballot unless the General Partner shall determine that it shall be by ballot or the holders of a majority of all Percentage Interests present in person or by proxy and entitled to participate in such vote shall so demand. In a vote by ballot each ballot shall state the Partnership Interests voted and the name of the Partner or proxy voting.

(f) Unless otherwise provided by law or by this Agreement, all questions shall be decided by the vote of the holders of a majority of the Percentage Interests present in person or by proxy at the meeting and entitled to vote on the question.

(g) Any action required or permitted to be taken at a meeting of Partners may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by Partners having not less than the minimum number of votes that would be necessary to authorize the action at a meeting at which all Partners entitled to vote thereon were present and voted, and shall be delivered to the Partnership by delivery to the General Partner. Prompt notice of the taking of action without a meeting shall be given to the Partners entitled to vote who have not consented in writing.

(h) The General Partner, in its sole discretion, shall establish all other provisions relating to meetings of Partners, in addition to those expressly provided herein, including notice of the time, place or purpose of any meeting at which any matter is to be voted on by any Partner, waiver of any such notice, action by consent without a meeting, the establishment of a record date, quorum requirements, voting in person or by proxy or any other

-30-

matter with respect to the exercise of any such right to vote, in each case consistent with the terms hereof and in accordance with the Act.

## ARTICLE IX:  ACCOUNTING AND RECORDS

Section 9.1 Books and Records.

The General Partner shall keep books of account for the Partnership in accordance with the method of accounting used for federal income tax purposes.  Upon at least five business days' prior notice to the General Partner, any Limited Partner shall have the right, to the extent provided for in the Act, to inspect and copy at its own expense the Partnership's books and records during normal business hours.

Section 9.2 Annual Business Plan.

The current Annual Business Plan for the Partnership for the Fiscal Year ending on December 31, 2005, is attached as **Exhibit B**.  By executing this Agreement or a counterpart signature page hereto, each Partner shall be deemed to have approved and ratified the initial Annual Business Plan.  Not later than 30 days before the last day of the first quarter of the next Fiscal Year, the General Partner shall prepare and submit the Annual Business Plan for the succeeding Fiscal Year to the Partners.  The Annual Business Plan shall be accepted as the Annual Business Plan for such Fiscal Year when it has been approved by the affirmative vote of the holders of at least 75% of the Class A Percentage Interests.  The approved Annual Business Plan shall be reviewed by the General Partner periodically and all necessary changes or revisions to the Annual Business Plan shall be resubmitted to the Partners and shall be accepted when approved by, and the General Partner shall not make any such changes to the Annual Business Plan without such approval by the affirmative vote of the holders of at least 75% of the Class A Percentage Interests.  The General Partner shall have the authority to take any action (including, without limitation, to make any operating or capital expenditure or sale) that is consistent with the Annual Business Plan.  In the event that an Annual Business Plan is not approved by the holders of the Class A Limited Partner Interests in accordance with this Section 9.2 within 30 days after its presentation to them, then the General Partner shall be authorized to take any action that is consistent with the most recently approved Annual Business Plan with an increase in permitted operating and capital expenditures based on the increase in the Consumer Price Index for all urban consumers for Southeastern Pennsylvania ("CPI") over the preceding calendar year, until such time as the then current Annual Business Plan is approved by the affirmative vote of the holders of at least 75% of the Class A Percentage Interests.

Section 9.3 Annual Reports.

(a) Not later than 90 days after the end of each Fiscal Year (or such earlier date as may be required under the Code) the General Partner shall deliver to each Partner a report indicating each Partner's share for federal income tax purposes of the Partnership's income,

credits and deductions for the immediately preceding Fiscal Year, together with all other information concerning the Partnership that may be required by the Code from time to time.

(b)   The General Partner shall also cause an annual report of the operation of the Partnership to be distributed to the Partners within 150 days after the end of each Fiscal Year together with Reviewed Financial Statements reflecting the Partnership's operation during that year.

(c)   The General Partner may also furnish the Limited Partners with such other periodic reports concerning the Partnership's business and activities as the General Partner considers necessary to advise all Partners properly about their investment in the Partnership and shall, upon the written request of any Limited Partner, provide the Partner with:

(i)   a copy of the Partnership's federal, state and local income tax returns for each Fiscal Year;

(ii)   a current list of the name and last known business, residence or mailing address of each Partner; and

(iii)   a copy of this Agreement and the Certificate and all amendments thereto, together with executed copies of all powers of attorney pursuant to which this Agreement, the Certificate and all amendments thereto have been executed.

Section 9.4Tax Returns.

The General Partner shall cause all income and other tax returns of the Partnership to be prepared and filed in a timely manner. The General Partner shall be the Tax Matters Partner (as defined in section 6231(a)(7) of the Code) of the Partnership.

Section 9.5Fiscal Year.

The fiscal year ("Fiscal Year") of the Partnership shall be the calendar year.

Section 9.6Bank Accounts.

All funds of the Partnership shall be deposited in such accounts established in the Partnership's name with such financial institutions as may be determined from time to time by the General Partner. Withdrawals from any such accounts shall be made in the Partnership's name upon the signature of such officers of the General Partner and such other signature or signatures, if any, as the General Partner shall from time to time designate. Funds in such accounts shall not be commingled with the funds of any Partner.

## ARTICLE X:  CHANGES IN GENERAL PARTNERS

Section 10.1                        Permitted Assignment of General Partner Interest;
Permitted Withdrawal by the General Partner.

The General Partner shall not have the right to resign or withdraw or to Transfer all or any portion of its General Partner Interest, except that the General Partner may (a) assign a portion of its General Partner Interest to an additional General Partner permitted under and selected in accordance with Section 10.2; (b) assign its General Partner Interest to any Entity that has, by merger, consolidation or otherwise, acquired substantially all of the assets and continued the business of the General Partner and has been designated to succeed to its rights and obligations under this Agreement in accordance herewith; and (c) pledge or grant a security interest in its right to receive payments and distributions under this Agreement.  In connection with any Transfer described in clause (b) of all its General Partner Interest, the General Partner may withdraw as such upon the admission of the assignee.  Sections 10.2 and 10.4 shall apply in the case of a Transfer of all or a portion of a General Partner Interest.

Section 10.2    Admission of Additional General Partners.

One or more additional General Partners may be admitted to the Partnership from time to time by the General Partner in the circumstances contemplated by Section 10.1. Otherwise, no additional General Partner may be admitted to the Partnership except as provided in Section 13.2.  The terms of such assignment and the nature of the duties of the newly admitted General Partner shall be as agreed upon between the General Partner and the additional General Partner.

Section 10.3    Effect of Withdrawal of General Partner.

(a) Upon the occurrence of an Event of Withdrawal of the General Partner (other than one permitted by Section 10.1), the General Partner shall cease to be such, and its Partnership Interest shall be converted to an undesignated Limited Partner Interest entitling the holder thereof to the same share of the Partnership's income, gain, loss, deduction and distributions as are allocated to the General Partner hereunder, subject to the Partnership's right to set off (i) any damages caused to it if the Event of Withdrawal is in violation of this Agreement and (ii) any obligation of the General Partner under paragraph (b).

(b) Upon the occurrence of an Event of Withdrawal of the General Partner, the General Partner shall pay to the Partnership in cash the amount of any deficit balance in its Capital Account unless the Event of Withdrawal is permitted by Section 10.1.

Section 10.4    Liability of a Withdrawn General Partner.

Any General Partner who shall commit or suffer an Event of Withdrawal or shall otherwise withdraw from the Partnership shall remain liable for obligations and liabilities incurred by it as General Partner prior to the occurrence of such Event of Withdrawal or other

-33-

withdrawal, but it shall be free of any such obligation or liability incurred on account of the activities of the Partnership thereafter.

## ARTICLE XI:  TRANSFERS OF LIMITED PARTNER INTERESTS

Section 11.1    General Transfer Provisions and Restrictions.

(a) No Limited Partner shall, directly or indirectly, Transfer all or any portion of, or right in or to, its Limited Partner Interest, except in compliance with the Securities Act and this Agreement.

(b) Subject to Sections 11.1(c) and (d), any Limited Partner may at any time Transfer all or any portion of, or right in or to, its Limited Partner Interest to any Person pursuant to Section 11.2 or to any of the following Persons:

(i)    with respect to a Limited Partner who is an individual:

(A) upon the death of the Limited Partner, to the Limited Partner's spouse and lineal descendants and spouses of the Limited Partner's lineal descendants; or

(B) to the Limited Partner's spouse, or a trust (or other estate planning vehicle), the income beneficiaries of which, or a corporation or a partnership, the stockholders or limited or general partners of which, include only the Limited Partner and/or the Limited Partner's spouse and children and spouses of the Limited Partner's children.

(ii)    with respect to a Limited Partner that is not an individual:

(A) to any corporation, partnership or other entity that is an Affiliate of the Limited Partner; provided, that the Affiliate or any Affiliate of such Affiliate does not compete with the business of the Company; or

(B) to any general or limited partner of any Affiliate of the Limited Partner; provided, that the general or limited partner or any Affiliate of such general or limited partner does not compete with the business of the Company.

(c) Notwithstanding anything to the contrary contained in this Agreement:

(i)    • no Transfer of any Limited Partner Interest shall be permitted if, in the opinion of the General Partner based on the advice of counsel, there is a significant possibility that such Transfer:

(A) may not be effected without registration under the Securities Act, or would result in the violation of any applicable state securities laws;

-34-

(B) would result in the termination of the Partnership within the meaning of section 708 of the Code, or would have a material adverse effect on any Partner for federal income tax purposes;

(C) would cause the Partnership to be taxed other than as a partnership for federal income tax purposes or impair the ability of the Partnership to take advantage of any favorable tax election or treatment as a result of being taxed as a partnership (whether such impairment shall arise from the termination of the Partnership for federal income tax purposes or otherwise);

(D) would cause the Partnership to become, with respect to any employee benefit plan subject to Title 1 of ERISA, a "party-in-interest" (as defined in Section 3(14) of ERISA) or a "disqualified person" (as defined in Section 4975(c) of the Code); or

(E) would cause any portion of the assets of the Partnership to constitute assets of any employee benefit plan pursuant to Department of Labor Regulations Section 2510.2-101; and

(ii)    No Limited Partner shall effect any Transfer:

(A) to any Person who lacks the legal right, power or capacity to own Partnership Interests;

(B) in violation of any provision of any mortgage or trust deed (or the note or bond secured thereby) to which the Partnership is a party or is otherwise bound; or

(C) of any component portion of Limited Partner Interests, such as the Capital Account, or rights to distribution, separate and apart from all other components of Limited Partner Interests.

In furtherance of this subsection, the General Partner and the Partnership shall in no event recognize any trade of a Limited Partner Interest in a secondary market or the substantial equivalent thereof and shall take such actions as are necessary so that such trades are not recognized.

(d) All Transfers of Limited Partner Interests shall be by instrument in form and substance reasonably satisfactory to the General Partner. Any Transfer of Limited Partner Interests in violation of this Agreement shall be null and void and shall not operate to vest any rights in any transferee.

(e) No Partner shall have the right to require redemption of such Partner's Partnership Interest, and neither the Partnership nor its General Partner(s) shall have any

-35-

obligation to cause any requested redemption to occur. Notwithstanding the foregoing, any Partner may at any time request redemption of its Partnership Interest by sending written notice of such request to the General Partner. Upon receipt of any such redemption request (and in the order received by the General Partner, if more than one such request is pending at any time), the General Partner shall endeavor in good faith to effect such redemption, including offering such Partnership Interest to the other Partners pursuant to Section 11.2 of this Agreement.

(f) In no event shall the Partnership dissolve or terminate upon the admission of any Limited Partner to the Partnership or upon any permitted Transfer of a Limited Partner Interest by any Limited Partner. Each Limited Partner hereby waives its right to dissolve, liquidate or terminate the Partnership in such event. No Transfer of any Limited Partner Interest in the Partnership shall constitute a change of Control of the Partnership.

Section 11.2   Right of First Refusal.

(a) If a Limited Partner shall desire to sell all or any portion of its Limited Partner Interest to and shall have received a bona fide offer to purchase all or that portion of its Limited Partner Interest from a third party, the Limited Partner (the "Selling Limited Partner") shall advise the General Partner in writing and, if so directed by the General Partner by written notice to the Selling Limited Partner, first offer to sell all or that portion of its Limited Partner Interest (the "Offered Interests") to each of the Limited Partners (the "Non-Selling Limited Partners"), upon the same terms and conditions as contained in the third party offer by giving written notice thereof to the Non-Selling Limited Partners (the "Selling Limited Partner's Notification"). Each Non-Selling Limited Partner shall either (i) notify the Selling Limited Partner of its election to exercise its right of first refusal (as described in the next paragraph), or (ii) grant its approval to the proposed Transfer.

(b) Each Non-Selling Limited Partner shall have the right to purchase a portion of the Offered Interests pro rata based on the Percentage Interest of the Limited Partners who exercise the right, by giving written notice of exercise to the Selling Limited Partner within 20 days after receipt of the Selling Limited Partner's Notification; provided, that the failure of a Non-Selling Limited Partner to exercise its right of first refusal under this Section 11.2 within the 20 day period shall be regarded as a waiver of its right to participate in the purchase of the Offered Interests. A Non-Selling Limited Partner may also indicate in its notice, if it so elects, its desire to purchase additional portions of the Offered Interests (indicating a maximum amount, if any) if any other Non-Selling Limited Partner does not exercise its right to purchase up to the full amount of its pro rata amount of the Offered Interests. The additional portions of the Offered Interests, if any, shall be allocated to the Non-Selling Limited Partners pro rata if more than one Non-Selling Limited Partner so elects, or less than pro rata with respect to any Non-Selling Limited Partner requesting a lower amount of the additional portion of the Offered Interests.

(c) In the event that the Non-Selling Limited Partners do not elect to purchase all of the Offered Interests from the Selling Limited Partner, the Selling Limited Partner shall be entitled to consummate the sale of the remaining Offered Interests to the third

party purchaser on the terms set forth in the Selling Limited Partner's Notification. If the remaining Offered Interests are not so sold by the Selling Limited Partner to the third party purchaser within 90 days following the date the Selling Limited Partner provides the Partnership and the Non-Selling Limited Partners with the Selling Limited Partner's Notification, they may not thereafter be sold without again providing the Non-Selling Limited Partners with the same right of first refusal as contained in this Section 11.2.

(d) The purchase price to be paid by each Limited Partner for the portion of the Offered Interests to be purchased by it pursuant to its rights of first refusal under this Section 11.2 shall be an amount equal to the product of (i) the price specified in the bona fide third party offer multiplied by (ii) the percentage portion of the Offered Interests to be purchased by the purchasing Limited Partners. Payment of the purchase price by the purchasing Limited Partners shall be made on the same terms as contained in the bona fide third party offer; provided, that each purchasing Limited Partner may, at its option, satisfy the purchase price by paying at least 10% of the purchase price in cash and issuing a promissory note in an initial principal amount equal to up to 90% of the purchase price. Any payment of the purchase price in cash may be made by wire transfer in immediately available funds or by certified or bank cashier's check. Any promissory note issued as payment of a portion of the purchase price shall have a maturity of one year or less and shall bear interest at an annual rate equal to the cost of funds for the then most recent Property loan obtained by the Partnership.

(e) Closing for the purchase of any Offered Interests purchased under this Section 11.2 shall occur at a time and place reasonably acceptable to both the Selling Limited Partner and the purchasing Limited Partners. If no time and place are agreed upon, the closing shall be held at the Partnership's principal office at 10:00 a.m. on the 40th day after receipt of the Selling Limited Partner's Notification (or, if such day is not a business day, the next succeeding business day). At the closing for the purchase of any Offered Interests under this Section 11.2, the Selling Limited Partner shall represent and warrant to the purchasers that the Offered Interests are held by the Selling Limited Partner free and clear of any lien, pledge, security interest or other encumbrance whatsoever (except for encumbrances under this Agreement) and that the purchasers of the Offered Interests are acquiring good title to the Offered Interests, free and clear of all liens, encumbrances and other objections or exceptions.

(f) The Selling Limited Partner shall also take, or cause to be taken, all actions and shall execute and deliver, or cause to be executed and delivered, all documents, writings, certificates, filings and other materials that may be reasonably necessary or appropriate to transfer the Offered Interests free and clear of all liens and other encumbrances and in accordance with all applicable federal and state laws, including without limitation, federal securities and tax laws. In the event the Selling Limited Partner shall fail or refuse to execute any such instruments, the purchasers are hereby granted an irrevocable power of attorney, that shall be binding on the Selling Limited Partner as to all third Persons, to execute and deliver on behalf of the Selling Limited Partner all such instruments of transfer. The aforesaid power being coupled with an interest is irrevocable by death, dissolution or otherwise.

(g) The payment of the purchase price shall be deemed conclusively to be in complete liquidation and satisfaction of all the rights and interest of the Selling Limited Partner, or its representative or the trustee and all persons claiming by, through, or under the Selling Limited Partner or its representative or trustee, in and in respect of the Offered Interests, including, without limitation, any rights in specific Partnership property, and any rights against the Partnership and (insofar as the affairs of the Partnership are concerned) against the Limited Partners with respect to the Offered Interests.

(h) After the closing for the purchase of any Offered Interests under this Section 11.2, the purchasers shall be subject to all Partnership obligations existing at the closing or arising thereafter, and the purchasers shall indemnify and hold harmless the Selling Limited Partner from and against all of those obligations.

(i) All agreements between the Limited Partners, and all agreements between the Partnership and the Selling Limited Partner, shall survive a sale pursuant to this Section 11.2 to the extent specified therein.

(j) Each Limited Partner shall pay its own expenses in connection with any Transfer under this Section 11.2.

Section 11.3   Expenses.

Except as provided in Section 11.2(l), all expenses of the Partnership and of the Partners occasioned by a permitted Transfer shall be borne by the Partner effecting the Transfer.

Section 11.4   Allocations with Respect to Transferred Interest.

Upon the permitted Transfer of all or any part of a Partnership Interest, each item of Partnership income (or loss) and deduction allocable to such Partnership Interest shall be pro rated (as to the Transferred Partnership Interest) between the transferor and transferee on the basis of the number of days in the taxable year of the Partnership preceding (and including) and succeeding, respectively, the date as of which the assignment is effective. Unless otherwise agreed by the transferor and transferee Partners, gain or loss from the sale or other taxable disposition of a Partnership capital asset shall be allocated to the Persons who were Partners at the time the gain or loss was recognized by the Partnership.

Section 11.5   Section 754 Election.

The General Partner may, in its sole discretion, cause the Partnership to elect, pursuant to section 754 of the Code, to adjust the basis of Partnership property as provided in sections 734(b) and 743(b) of the Code. The General Partner shall be responsible for determining the adjustments required or permitted by those sections of the Code, except that, in the case of any adjustment required or permitted under section 743(b) of the Code, the transferee Partner or Partners shall be solely responsible for determining the adjustments required thereunder unless the Partner or Partners provide the General Partner with all the information

necessary for the General Partner to determine the adjustments.  If any adjustments to the basis of Partnership property are made pursuant to section 732(d), 734(b) or 743(b), the Capital Accounts of the Partners shall be adjusted as specified in Section 1.704-1(b)(2)(iv)(m) of the Regulations.

Section 11.6    <u>Transferee's Rights</u>.

The Transfer of a Limited Partner Interest in accordance with this Agreement entitles the transferee to share in the profits and losses, to receive the distributions, and to receive the allocations of income, gain, loss, deduction, or credit or similar item to which the transferor Partner was entitled (to the extent of the interest Transferred), but does not entitle the transferee to become or to exercise any other rights of a Partner unless and until the transferee Partner has been admitted as a Partner pursuant to Article XII.

ARTICLE XII:  ADMISSION OF PARTNERS

Section 12.1    <u>Procedure</u>.

(a) Substitute or additional General or Limited Partners may be admitted to the Partnership as a result of a permitted Transfer of Partnership Interests pursuant to Article X or XI.  Additional Limited Partners may also be admitted to the Partnership by the General Partner at any time in its sole discretion through the issuance of Limited Partner Interests from existing classes or, subject to Section 8.3(f), additional classes.  Additional General Partners may also be admitted to the Partnership pursuant to Section 13.2.  Each substitute or additional Partner shall sign a supplement to this Agreement at the time the Partner is admitted confirming the admission of the new Partner hereunder, and containing the Person's binding agreement to be bound by all of the terms of this Agreement.

(b) In connection with the admission of any new Partner to the Partnership, the General Partner shall have the power, right and authority to amend this Agreement and **Exhibit A** to reflect the rights and obligations of the new Partner, including without limitation its obligations to contribute to the capital of the Partnership, rights to distributions, or rights to approve or consent to Partnership actions.

ARTICLE XIII:  DISSOLUTION, LIQUIDATION AND WINDING-UP

Section 13.1    <u>Events of Dissolution</u>.

The occurrence of any of the following shall constitute an event of dissolution of the Partnership (an "Event of Dissolution"):

(a) the sale or other disposition in a single transaction or series of related transactions of all or substantially all of the assets of the Partnership unless the sale or other

-39-

disposition involves any deferred payment of the consideration for the sale or disposition, in which case the General Partner may elect to defer the dissolution of the Partnership until the last day of the taxable year during which the Partnership will receive the balance of the deferred payment;

(b) the insolvency or bankruptcy of the Partnership, or an assignment by the Partnership for the benefit of creditors;

(c) subject to Section 13.2, the occurrence of an Event of Withdrawal with respect to a General Partner;

(d) the acquisition by a single Person of all of the Partnership Interests;

(e) the issuance of a decree of dissolution by a court of competent jurisdiction pursuant to Section 8572 of the Act;

(f) the determination of the General Partner to dissolve the Partnership; or

(g) the written consent of all Partners.

Section 13.2                    Continuation of the Business of the Partnership After Certain Events of Dissolution.

(a) Notwithstanding Section 13.1(d), if, at the time of an Event of Withdrawal, there shall be one or more General Partners not affected by the Event of Withdrawal, then such other General Partner or General Partners shall (and are hereby authorized to) carry on the business of the Partnership, and if they do so the Partnership shall not be liquidated and its business wound up.

(b) Notwithstanding Section 13.1(d), at the time of an Event of Withdrawal to which subsection (a) is not applicable, the Partnership shall not be liquidated and its business wound up if, within 180 days after the occurrence of the Event of Withdrawal, Limited Partners owning a majority of the Percentage Interests of each class of Limited Partner Interests agree in writing to continue the business of the Partnership and to the appointment of one or more replacement General Partners who agree to serve as such.

Section 13.3   Effect of Event of Dissolution.

Upon the occurrence of an Event of Dissolution, unless the business of the Partnership is continued as provided in Section 13.2, the Partnership shall be dissolved and shall continue solely for the purposes of winding up its business and liquidating in accordance with this Article all of its assets and collecting the proceeds from the liquidation, at which time the Partnership shall be wound up. Unless the business of the Partnership is continued as provided in Section 13.2, after the occurrence of an Event of Dissolution the Partnership shall engage in no further business other than as necessary to operate on an interim basis and for the Partnership

to collect its receivables, liquidate its assets and pay or discharge its liabilities in accordance with this Article. The General Partner shall select an individual or Entity to serve as the liquidating trustee (which individual or Entity may include the General Partner or an Affiliate of the General Partner), and the liquidating trustee so selected shall agree in writing to be bound by the terms of this Agreement. The liquidating trustee shall be empowered to give and receive notices, reports and payments in connection with the dissolution, liquidation and winding-up of the Partnership and shall hold and exercise such other rights and powers as are necessary or required to permit all parties to deal with the liquidating trustee in connection with the dissolution, liquidation and winding-up of the Partnership.

Section 13.4   <u>Accounting</u>.

In the event of the dissolution, liquidation and winding-up of the Partnership, a proper accounting (which shall be certified) shall be made of the Capital Account of each Partner and of the Net Income or Net Losses of the Partnership from the date of the last previous accounting to the date of dissolution. Financial statements presenting such accounting shall include a report thereon of a certified public accountant selected by the liquidating trustee.

Section 13.5   <u>Distribution on Dissolution</u>.

(a) In the event of the dissolution, liquidation and winding-up of the Partnership for any reason, the assets of the Partnership shall be liquidated for distribution and distributed in the following rank and order:

(i)     first, for payment of creditors of the Partnership (other than Partners) in the order of priority as provided by law;

(ii)     next, for establishment of reserves as provided by the liquidating trustee to provide for contingent liabilities, if any;

(iii)     next, for payment of debts of the Partnership to Partners, if any, in the order of priority provided by law; and

(iv)     thereafter, to the Partners in the amounts and with the priorities set forth in Section 6.1.

(b) Whenever the liquidating trustee reasonably determines that any reserves established pursuant to paragraph (a)(ii) above are in excess of the reasonable requirements of the Partnership, the amount determined to be excess shall be distributed to the Partners in accordance with the above provisions.

Section 13.6   <u>Timing Requirements</u>.

In the event that the Partnership is "liquidated" within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, any and all distributions to the Partners pursuant to

-41-

Section 13.5(a) shall be made no later than the later to occur of (i) the last day of the taxable year of the Partnership in which the liquidation occurs, or (ii) 90 days after the date of the liquidation.

Section 13.7    Sale of Partnership Assets.

In the event of the liquidation of the Partnership in accordance with the terms of this Agreement, the liquidating trustee may sell Partnership property if the liquidating trustee has in good faith solicited bids from unrelated third parties before making any such sale. All sales, leases, encumbrances or transfers of Partnership assets shall be made by the liquidating trustee solely on an "arm's-length" basis, at the best price and on the best terms and conditions as the liquidating trustee in good faith believes are reasonably available at the time and under the circumstances and on a non-recourse basis to the Limited Partners. The liquidation of the Partnership shall not be deemed finally completed until the Partnership shall have received cash payments in full with respect to obligations such as notes, installment sale contracts or other similar receivables received by the Partnership in connection with the sale of Partnership assets and all obligations of the Partnership have been satisfied, released or assumed by the General Partner. The liquidating trustee shall continue to act to enforce all of the rights of the Partnership pursuant to any such obligations until the obligations are paid in full or otherwise satisfied.

Section 13.8    Distributions in Kind.

In the event that it becomes necessary to make a distribution of Partnership property in kind, the liquidating trustee may transfer and convey the property to the distributees as tenants in common, subject to any liabilities attached thereto, so as to vest in them undivided interests in the whole of the property in proportion to their respective rights to share in the proceeds of the sale of the property (other than as a creditor) in accordance with the provisions of Section 13.5.

Section 13.9    Documentation of Liquidation.

Upon the completion of the dissolution and liquidation of the Partnership, the Partnership shall terminate and the liquidating trustee shall have the authority to execute and record any and all documents or instruments required to effect the dissolution, liquidation and termination of the Partnership.

Section 13.10    Liability of the Liquidating Trustee.

The liquidating trustee shall be indemnified and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever arising out of or incidental to the liquidating trustee's taking of any action authorized under or within the scope of this Agreement; except that the liquidating trustee shall not be entitled to indemnification, and shall not be held harmless, where the claim, demand, liability, cost, damage or cause of action at issue arose out of:

-42-

(a) a matter entirely unrelated to the liquidating trustee's action or conduct pursuant to the provisions of this Agreement; or

(b) the fraudulent act, willful misconduct or gross negligence of the liquidating trustee.

## ARTICLE XIV: RIGHTS AND OBLIGATIONS OF THE LIMITED PARTNERS

### Section 14.1    No Participation in Management.

The Limited Partners shall not take part in the management or control of the Partnership's business, transact any business in the Partnership's name, have the power to sign documents for or otherwise bind the Partnership or, except as required by the Act or expressly provided by this Agreement, have any right to vote on or consent to any matter. Nothing in this section shall be deemed to prohibit or preclude any Limited Partner or its Affiliates from serving as an officer, trustee, director or employee of the General Partner or its Affiliates or otherwise transacting business with the Partnership.

### Section 14.2    Death, Incompetence, Bankruptcy, Etc.

The death, incompetence, Bankruptcy, dissolution or liquidation of a Limited Partner shall not cause a dissolution of the Partnership. The rights of such a Limited Partner to share in the income and losses of the Partnership, to receive distributions and to assign its Partnership Interest pursuant to this Article, on the happening of such an event, shall devolve on the Limited Partner's beneficiary or other successor, executor, administrator, guardian or other legal representative for the purpose of settling the estate or administering the property of the Limited Partner. The successor or personal representative, however, shall be admitted as a Limited Partner only upon compliance with the requirements set forth in Section 12.1(a).

### Section 14.3    No Withdrawal.

A Limited Partner may not withdraw from the Partnership without the prior written consent of the General Partner, other than as expressly provided in this Agreement.

### Section 14.4    Power of Attorney.

(a) Each Limited Partner constitutes and appoints the General Partner, any liquidating trustee, and authorized officers and attorneys-in-fact of each, and each of those acting singly, in each case with full power of substitution, as its true and lawful agent and attorney-in-fact, with full power and authority in its name, place and stead to: execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (i) all certificates, documents and other instruments (including, without limitation, this Agreement and the Certificate and all amendments or restatements thereof) that the General Partner or the liquidating trustee deems appropriate or necessary to form, qualify or continue the existence or

-43-

qualification of the Partnership as a limited partnership (or a partnership in which the limited partners have limited liability) in the Commonwealth of Pennsylvania and in all other jurisdictions in which the Partnership may conduct business or own property; (ii) all instruments that the General Partner deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement in accordance with its terms; (iii) all conveyances and other instruments or documents that the General Partner deems appropriate or necessary to reflect the dissolution and liquidation of the Partnership pursuant to the terms of this Agreement, including, without limitation, a certificate of cancellation; and (iv) all instruments relating to the admission, withdrawal, removal or substitution of any Partner pursuant to the provisions of this Agreement, or the Capital Contribution of any Partner.

(b) The foregoing power of attorney is irrevocable and a power coupled with an interest, in recognition of the fact that each of the Partners will be relying upon the power of the General Partner to act as contemplated by this Agreement in any filing or other action by it on behalf of the Partnership, and it shall survive the death, incapacity or incompetency of a Limited Partner to the effect and extent permitted by law and the Transfer of all or any portion of a Limited Partner's Limited Partner Interests and shall extend to the Limited Partner's heirs, distributees, successors, assigns and personal representatives.

Section 14.5    Limited Liability of Limited Partners.

The Limited Partners shall not be personally liable for any obligations or debts of the Partnership to third parties, except to the extent provided in the Act.

## ARTICLE XV:  LIMITED PARTNER REPRESENTATIONS AND WARRANTIES

Section 15.1    Representations and Warranties of the Limited Partners.

Each of the Limited Partners hereby represents and warrants, severally and not jointly, to the Partnership and the General Partner as follows:

(a) That such Limited Partner, if a corporation, partnership or other Entity formed pursuant to any statute or other governmental authority, is validly formed and in good standing under the laws of the jurisdiction of its formation.

(b) That, if such Limited Partner is an Entity, the execution, delivery and performance of this Agreement by such Limited Partner has been duly and validly authorized by all necessary corporate, partnership, or other similar action.

(c) That this Agreement has been duly executed and delivered by such Limited Partner, and constitutes such Limited Partner's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof.

(d) That no consent, waiver, approval or authorization of, or filing, registration or qualification with, or notice to any governmental unit or other person is required to be made, obtained or given by such Limited Partner in connection with the execution, delivery and performance of this Agreement and the transactions contemplated hereby other than consents, waivers, approvals or authorizations which have been obtained prior to the date hereof.

(e) That such Limited Partner understands that the Limited Partner Interests to be issued hereunder will not be registered under the Securities Act, on the grounds that the issuance of such securities is exempt from registration pursuant to Section 4(2) of the Securities Act or Regulation D promulgated thereunder, and that the reliance of the General Partner and the Partnership on such exemptions is predicated in part on the Limited Partner's representations, warranties and covenants set forth herein.

(f) That the Limited Partner Interests will be acquired for its own account, not as a nominee or agent, and without a view to resale or other distribution within the meaning of the Securities Act and the rules and regulations thereunder and that it will not distribute any such securities in violation of the Securities Act.

(g) That such Limited Partner's principal residence or place of business is as set forth on **Exhibit A** (which is based on the address provided on the signature page hereto).

(h) That such Limited Partner understands that the Limited Partner Interests must be held indefinitely unless subsequently registered under the Securities Act or an exemption from registration is available.

(i) That such Limited Partner is an "accredited investor" as defined under Regulation D promulgated under the Securities Act and is well versed in financial matters, has had dealings in securities, including "restricted securities," and is fully capable of understanding the type of investment being made in the Limited Partner Interests and the risks involved in connection therewith.

(j) That such Limited Partner will not sell transfer or otherwise dispose of any of the Limited Partner Interests unless such securities have been registered under the Securities Act or the holder thereof shall have furnished to the General Partner such information as the General Partner may reasonably require to the effect that such securities may be sold without registration thereunder.

## ARTICLE XVI: GENERAL PARTNER REPRESENTATIONS AND WARRANTIES

The General Partner represents and warrants to the Partnership and the Limited Partners as follows:

-45-

### Section 16.1    Organization.

The General Partner is validly existing and in good standing as a limited liability company under the laws of the Commonwealth of Pennsylvania.

### Section 16.2    Due Authorization; Binding Agreement.

The execution, delivery and performance of this Agreement by the General Partner has been duly and validly authorized by all necessary limited liability company action of the General Partner. This Agreement has been duly executed and delivered by the General Partner, and constitutes a legal, valid and binding obligation of the General Partner, enforceable against the General Partner in accordance with the terms hereof.

### Section 16.3    Consents and Approvals.

No consent, waiver, approval or authorization of, or filing, registration or qualification with, or notice to, any governmental unit or any other person is required to be made, obtained or given by the General Partner in connection with the execution, delivery and performance of this Agreement other than consents, waivers, approvals or authorizations which have been obtained prior to the date hereof.

## ARTICLE XVII:  GENERAL PROVISIONS

### Section 17.1    Notices.

All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and may be personally served, faxed, delivered by reputable courier service or sent by United States mail and shall be deemed to have been given when delivered in person, upon receipt of fax or courier service or three business days after deposit in United States Mail, registered or certified, postage prepaid, and properly addressed, by or to the appropriate party. For purposes of this Section 17.1, the addresses of the parties hereto shall be as set forth on **Exhibit A** (which is initially based on the address provided on the signature page hereto). The address of any party hereto may be changed by a notice in writing given in accordance with the provisions of this Section 17.1.

### Section 17.2    Successors.

This Agreement and all the terms and provisions hereof shall be binding upon and shall inure to the benefit of all Partners, and their legal representatives, heirs, successors and permitted assigns, except as expressly herein otherwise provided.

-46-

Section 17.3    Effect and Interpretation.

This Agreement and all of the terms and provisions hereof shall be governed by and construed in accordance with the law, including the law on conflicts of law, of the Commonwealth of Pennsylvania.

Section 17.4    Counterparts.

This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

Section 17.5    Partners Not Agents.

Nothing contained in this Agreement shall be construed to constitute any Partner the agent of another Partner, except as specifically provided herein, or in any manner to limit the Partners in the carrying on of their own respective businesses or activities. Notwithstanding anything to the contrary contained in this Agreement, no recourse shall be had by the Partnership or any Partner against any trustee, director, shareholder, officer, employee, agent or attorney of the General Partner under this Agreement, and none of the foregoing shall have any personal liability for or with respect to any of the foregoing.

Section 17.6    Entire Understanding; Etc.

This Agreement constitutes the entire agreement and understanding among the Partners and supersedes any prior understandings and/or written or oral agreements among them respecting the subject matter of this Agreement.

Section 17.7    Amendments.

(a) Except as specifically restricted in this Agreement, the General Partner shall have the power and authority, in its sole discretion and without the consent of any other Partner, to amend any and all of the provisions of this Agreement or **Exhibit A**, including to issue additional Partnership Interests, or to establish the rights, privileges, duties and obligations of any Partner or class of Partnership Interest, or otherwise. Without the consent of each existing Partner adversely affected thereby, the General Partner shall not (except, in each and every case, as may be required to correct plain errors or ambiguities in this Agreement) amend this Agreement so as to (i) require any Partner to make any additional contribution to the capital of the Partnership; or (ii) require any Partner to restore any negative balance in its Capital Account or otherwise to contribute any capital to the Partnership, except as required under the Act, the Code or other applicable laws or as expressly provided herein. In addition, this Agreement shall not be amended without the prior written consent of each Partner adversely affected if the amendment would (i) convert a Limited Partner Interest in the Partnership into a General Partner Interest, (ii) modify the limited liability of a Limited Partner, or (iii) modify the distribution

-47-

rights of the Class B Limited Partners under Sections 6.1(b), 6.2 or 13.5 or the related allocation rights of the Class B Limited Partners under Section 7.1.

(b) For so long as any Class A Limited Partner Interests remain outstanding, this Agreement may not be amended unless the amendment is approved by the holders of 75% of the Class A Percentage Interests, except to:

(i)    add to the obligations of the General Partner or surrender any right or power granted to the General Partner or any Affiliate of the General Partner for the benefit of the Limited Partners;

(ii)    reflect the issuance of additional Partnership Interests, and the admission, substitution, termination or withdrawal of Partners, in each case in accordance with the provisions of this Agreement;

(iii)    record permitted Transfers of Partnership Interests on the books of the Partnership;

(iv)    reflect a change that is of an inconsequential nature and does not adversely affect the holders of the Class A Limited Partner Interests in any material respect; or

(v)    cure any ambiguity or correct plain errors in this Agreement.

(c) The General Partner will provide notice to the Limited Partners promptly after any action under paragraph (b) is taken.

(d) This Section 17.7 may not be amended except with the prior written consent of the General Partner and the holders of 75% of the Percentage Interests of each class of Limited Partner Interests.

Section 17.8    Severability.

If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid by such court, shall not be affected thereby.

Section 17.9    Interpretation.

As used herein, all pronouns shall include the masculine, feminine and neuter, and all terms shall include the singular and plural thereof wherever the context and facts require such construction. The headings, titles and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof. Any references in this

Agreement to "including" shall be deemed to mean "including without limitation." References to Sections are to sections of this Agreement unless otherwise specified.

## Section 17.10  Assurances.

Each of the Partners shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed as of the date first above written.

**GENERAL PARTNER:**

SPECTRUM ALLIANCE SERVICES GP, LLC

By: _____

Name:     James R. Wrigley
Title:      Sr. VP of Managing Member

**CLASS A LIMITED PARTNERS:**
TREFOIL ACQUISITIONS, LLC

Signed: _____

Printed Name: James R. Wrigley

Title (if applicable): Sr. VP of Managing Member

Address:     1690 Sumneytown Pike, Suite 190
             Lansdale, PA 19446
             _____

Telephone: 215-855-5100

SS#/EIN#: 16-1645154

**CLASS B LIMITED PARTNER:**

SPECTRUM ALLIANCE SERVICES CO, LLC

By: _____

Name:     James R. Wrigley
Title:      Sr. VP of Managing Member

[Signature Page to Agreement of Limited Partnership of Spectrum Alliance, LP]



# 2009 Business Plan

*This Business Plan shall be adopted upon acceptance by those parties with aggregate holdings of at least 75% of the outstanding Class A Limited Partnership Units of Spectrum Alliance. Responses must be received in writing within 30 days of delivery of this Business Plan, or approval shall be deemed granted for such Limited Partner's interests per the Limited Partnership Agreement. In the event that more than 25% of Limited Partners decline approval in writing within the prescribed time period, the previous Business Plan shall survive until such time as a revised Business Plan is resubmitted and accepted. All responses to this Business Plan must be in writing and submitted to the following address:*

*Spectrum Alliance, LP*
*c/o Trefoil Properties, LP*
*1690 Sumneytown Pike, Suite 240*
*Lansdale, Pennsylvania 19446*
*Attention: Robert T. Wrigley*

*The Business Plan has been prepared by Trefoil Properties, LP and Trefoil Management, LLC ("TMLLC"), asset managers for the Fund. It has been reviewed by Spectrum Alliance's Advisory Board, a panel of individuals with concentrations in real estate, finance, economics, accounting and law.*



## Economic Analysis

### How we got here

During Spectrum's 2008 Annual Meeting, we spoke of the extraordinary economic events that have taken place since the middle of 2007, and the following is our summary of the timeline:

- Low interest rates, poor underwriting and improperly incentivized residential mortgage practices contributed to an overheated residential market;

- Home prices (and the underlying mortgages) swelled at rates significantly higher than inflation, causing a circular and seemingly endless rise in valuations. Areas most affected by this hyper-pricing included California, Florida and Las Vegas;

- In the commercial real estate sector, the bubble was not as severe. However, the more aggressive and marketing-driven financial entities (such as the 1031 sponsors and Wall Street firms) exhibited little restraint and fueled additional pockets of excessive pricing;

- Lax underwriting and careless credit ratings for mortgage-backed securities (RMBS and CMBS, and later Collateralized Debt Obligations) led to further illiquidity causing investors to question the entire asset class;

- As liquidity in collateralized credit markets seized up, the banking system's capital base was severely eroded. The government, fearful of the implications of a credit freeze, began a series of responses including: interest rate cuts, broadening the Fed window's purpose, facilitating corporate bailouts and negotiated takeovers, and the creation of the now infamous TARP (Troubled Asset Recovery Program);

- The credit squeeze did, in fact, cascade from the mortgage-backed markets, impacting corporate bonds and infecting the entire spectrum of fixed income securities;

- The credit turmoil riveted the attention of Main Street (the consumer), and the ensuing pullback and paralysis became global in scope, triggering significant volatility in the international equities markets;

- In the absence of credit availability, highly-leveraged companies, even those with relatively healthy underlying assets, teetered on the edge of bankruptcy.

The illustration on the next page illustrates the progression of events noted above:



### So where will the economy head in 2009 and beyond?

We forecast that the **credit markets will find initial traction during the first quarter of 2009**, as the massive and coordinated reactions by governments around the globe take effect (approximately $9 trillion in global interventions by governments have been initiated as of November 2008). However, certain aspects of the credit markets (particularly the mortgage-backed securities market and the Credit Default Swaps) will require years to heal, extending those areas of stress. Accordingly, **credit will return with some normalcy, but with less initial competition, causing spreads to remain elevated until a broader base is established.**

We expect the **residential markets will show clear signs of having bottomed by the first quarter of 2009**, when greed, stimulated by low pricing, will begin to reduce inventories. As the residential market was the harbinger of the downturn, its traction will provide the foundation for the economy's rebound. The recovery will be gradual, and **we expect that 2009 will exhibit minimal growth, with traditional GDP increases returning by mid-2010.**

We feel that **government intervention (i.e. increased money supply with its implied management covenants and regulation) will cause elevated long-term inflation rates, perhaps as early as 2010.** Inflation in real estate may also be impacted by the new administration's bias toward organized labor and governmental growth. **Although inflation has certain negative consequences, it encourages investment in the real estate sector which has historically been a natural hedge against inflation. Spectrum's granular, hands-on management of its portfolio, within a geographically concentrated area, and having a long term investment philosophy should resonate with the future economic environment.**

**Trefoil predicts that it might be 2012-2013 before the equities markets return to their pre-turmoil values.**

### Spectrum's portfolio

**Spectrum was built as a diversified portfolio, having a high quality, cash flowing foundation of assets to provide stability. That strategic planning has been propitious during this turbulent cycle.** Our portfolio, consisting of high quality assets in strategic locations, has benefited from the current flight to quality by both tenants and lenders. As of the 4th quarter of 2008, **our stabilized portfolio stood at 92% occupancy, with 64% of its rent roll represented by creditworthy companies. If analyzed by percentage of rental income, that same group of tenants constituted 54% of the portfolio, providing a very strong foundation.**

**In addition, the portfolio's lease expiration schedule is well designed to weather the economic downturn. Future years indicate lease expirations of 4.8% of the rent roll in 2009, 9.9% in 2010 and 4.3% in 2011, very modest exposures by any yardstick.** With even these modest expirations, we would expect to retain more than two-thirds of these expiring tenants based on historical conversion rates.

**Spectrum also exhibits a diversified mortgage pool totaling ~$143 million as of the end of the 3rd quarter of 2008. Of that total, approximately half ($79 million) are variable rate loans maturing by the end of 2009. However, many of those loans have built-in extensions, reducing the expected 2009 refinancings to $43 million. Of that amount, only $16 million are loans on development properties. The balance are loans on well leased, stabilized projects that continue to be appealing to permanent lenders and, therefore, represent modest exposure.**

On the equity side of the equation, Spectrum will continue to raise equity to fuel its growth, as evidenced by the $12 million raised in the first three quarters of 2008. Spectrum will also continue to seek institutional partnerships for capital, which may come from the preferred equity

4

sector or from mezzanine lenders (essentially the same as preferred equity). As our portfolio is of such high quality, we would expect to see very favorable underwriting, as well as reasonable documentation by equity and debt sources.

## Spectrum's planning through 2010

**The fund will continue to raise capital to fund its targeted growth to $500 million in assets, and will employ a "hold" philosophy on its portfolio during that timeframe.** While our continued planning is to reach this goal by the end of 2010, the current credit climate may extend the target into 2011. As of mid-2008, we had achieved approximately $220 million in assets. Meaningfully, the portfolio had matured, increasing the stabilized segment to approximately 78% of asset value (vs. 60% in October 2007). As noted previously, some portion of Spectrum's new capital is expected from institutional resources, and may take on a slightly different structure than straight Limited Partner equity. With these anticipated proceeds, we will target acquisitions of stabilized properties. **With the current market dislocation, we employ our "value" approach to purchases, targeting prime locations and strongly tenanted buildings. Whether the correction goes beyond the normal NOI/discounted cash flow curve is yet to be seen, however, we will be poised to either:**

- **purchase at defensive values (we see the potential for a 5-7% further decrease in values) or,**
- **develop those sites which have achieved conservative pre-leasing levels. As reinforced by our history, developing our own assets ensures higher quality controls through managing the design, construction and leasing processes.**

Our geographic focus remains consistent with previous reports. We will continue to seek projects in Pennsylvania, New Jersey, Delaware and Maryland. As noted in the 2008 annual meeting, we remain focused on the Lehigh Valley / Pocono region, the "BRAC" areas in the Washington, DC and Annapolis region (BRAC is an acronym for the Base Closure and Realignment Commission, under which tens of thousands of new jobs are expected to flow into this general area) and the Delmarva Peninsula for establishing new submarket concentrations for Spectrum's portfolio. Within our existing footprint, we continue to be particularly interested in opportunities located in Southern and Central New Jersey.

## Partnership Planning

A) Spectrum intends to enact the following operating practices through the adoption of this business plan:
1. Limited Partners have been offered the option of receiving quarterly distributions in cash or through the reinvestment of those funds into additional Partnership Units. If distributions are reinvested, the reinvestment will occur quarterly such that future distributions will accumulate on the reinvested distributions (quarterly compounding).

**B) As part of our evolving structure and maturation, we intend to refine the fund's capital events fee, such that it is more easily tracked and recorded. That change is not intended to change the magnitude of the fee, merely the form.**

C) Our valuation practice to date has been to value the entire Spectrum portfolio approximately every two years. We have performed these valuations such that one half of the portfolio is valued each year (i.e. appraisals performed on a rotating basis). Due to the request by an institution with which we were negotiating this past summer, and based on recent market volatility, **we have updated the appraisals for the stabilized portfolio as of the third quarter of 2008.** We would like to highlight that those appraisals resulted in project valuations nearly identical to Spectrum's internal calculations. **CB Richard Ellis' analysis came in less than ¾ of 1% lower than Spectrum's – well within a statistical and assumptive error range (estimated at 3.0-4.0%).**

**Therefore, we do not intend to perform additional appraisals for these assets (except for those required by financing transactions) until 2010, at which time we will revert to one half of the portfolio per year.** Accordingly, the 2009 valuation update will be based on management's estimates and interpolations.

It's important, when viewing the valuation of our portfolio, to keep in mind that market value is the price to be paid by an informed buyer, within a reasonable time period, in the then current market environment. However, under current conditions, there is no good gauge of the current market. For example, more then several of the largest REIT's are attempting to sell groups of investment grade properties as a result of their declining stock prices pressuring their cash positions. Many of those have now pulled those sales packages from the market due to their inability to achieve price thresholds. We have not seen a significant discounting to Class A office or retail product to date (other than the elimination of the "froth" characteristic of the past run-up of pricing). As evidence of the market's seizing up, certain REIT stocks are being priced at a 50% capitalization rate for their underlying real estate (equating to a forward P/E ratio of 2!) This is clearly an illogical anomaly, and we expect to see a return to more orderly markets in the last half of 2009. Unfortunately, unless one is able to specifically analyze the underlying assets, it is difficult to differentiate between the REITs that are unfairly undervalued and the ones that are imprudently overleveraged.

As Spectrum has always had a long term hold philosophy, we will continue that course, awaiting the latter half of '09 recovery to evidence a return to a NOI valuation curve.

We agree with Warren Buffet's view that his "favorite holding period is forever", and his belief that a) "compounding is a beautiful thing" and b) "what happens in the short term is completely out of anyone's control" (Motley Fool - Nov 20, 2009).

Many of us have witnessesed the rewards offered during recovery periods in the past, especially if a solidly constructed portfolio is well protected, and only patient, thoughtful, offensive moves are undertaken.

### Conclusion
**Our long-term philosophy has proven to be both prudent and in today's economic climate, a strength. Our core, cash-flowing assets provide a powerful foundation in the midst of a difficult credit climate, allowing us to better react to opportunities that will build value for investors.**

Existing properties, being strategically located, are experiencing that same benefit:
- Cedar Hill Shopping Center's values are being further enhanced by the 2 million square foot hospital, now under construction, across Route 73;
- Hawthorne and Gwynedd will also be enhanced by the nearby $200 million highway starting construction next month.

We will continue to buttress the portfolio against current economic exigencies, so that we are best positioned to benefit from the inevitable recovery. We expect that the coming months will yield the best acquisition opportunities that we've seen since Spectrum was conceived. Accordingly, the fund's continuing growth plans are well-timed. This strategy will be applied with the controls and prudence that have been part of our business philosophy since Spectrum was launched. A brief synopsis of those core beliefs are listed on the following two pages.



Spectrum
ALLIANCE, L P

## Corporate Characteristics

### Reasonableness

- **Sound assumptions & valuations**
- **Reasonable expectations** *dependent upon conservative, thoughtful planning, not praying (although it helps)*
- **Stick with fundamentals** *when faced with problems*

### Resonance

- **All executives touching real estate** *(familiar with assets, markets, project variables, and ability to execute)*
- **Ability to resonate with others** *(approval officials, lenders, neighbors, vendors, investors, sellers, tenants ) and to view from their prospective, and to steadily progress toward specific goals*

7

# Approvals and Permits

- Zoning
- Lot consolidation plan
- Subdivision plan
- Private party settlement agreements
- Condominium Declaration Preliminary
- Land Development plans
- Final Land Development
- Plans Land Development / Escrow agreement
- Off site improvement agreement
- Highway Occupancy Permit
- DEP planning module
- Utilities
  - Fire/Police recommendations
  - Water service agreement
  - Sewer service agreement
  - Electric Service Agreement
  - Gas Service Agreement
  - Phone Service Agreement
- Traffic study

- Environmental site analysis
- Soil Conservation District
- County planning commission approval
- Township engineer recommendation
- Grading Permit
- Traffic signal permit
- Sign permit
- Township Building permit
- State (ADA) permit
- As-Built / Record Drawing
- Building Permit including certifications
  - Architectural
  - Structural
  - HVAC
  - Electric
  - Sprinkler
  - Plumbing
- State Certificate of Occupancy (ADA)
- Township Certificate of Occupancy
- Business licenses

8

As offered in previous years' business plans, Spectrum has solicited third party economic analysis to balance against its own. Below is Dr. Joel Naroff's analysis as of November 2008 of the outlook for the next few years. We'd like to highlight that Dr. Naroff was recently recognized with three awards from national economic forums.

We are proud to announce, that in October, Dr. Naroff was named by Bloomberg the Nation's top economic forecaster for 2008. Joel was also honored recently as the recipient of the Lawrence R. Klein Award, which is recognized as one of the most prestigious and longest-standing awards in the economic profession. Joel also received the National Association for Business Economics award as 2007's top economic forecaster.

## 2009 Naroff Economic Outlook

### The economy is reeling

The financial market meltdown has stabilized. That's the good news. Unfortunately, sanity has not returned. Large swings in the equity markets are now a way of life. But concerns about the potential failure of additional major firms have dissipated. However, the key question still remains: How long and how steep will this recession be and how do we get out of it?

That we are in a recession is no longer a question. Yes, the Business Cycle Dating Committee has not yet officially called the turn. But one look at the jobs numbers confirms it. Businesses cut workers for the tenth consecutive month in October and the job losses are accelerating. When you add the 240,000 lost positions to those that came before, 1.2 million jobs have disappeared this year. Shrinking payrolls mean rising unemployment and the rate now stands at 6.5%, the highest level since March 1994.

What is amazing is the speed at which firms have reacted to the faltering economy. Normally, managers retain their people as long as possible out of fear of losing them. But with real time information about the state of the economy, companies appear to be hunkering down and looking to ride out the storm. The first places they turn for cost savings is their labor expenses, and they have moved quickly to adjust.

The job loss implications are truly troubling. Falling employment means less income and that translates into declining consumer spending. That is made all the worse by the collapse of consumer confidence to some of the lowest levels we have ever seen. The retail sector has been hurt and 2008 is not likely to be a very merry holiday season for many. That also points to problems in early 2009, as firms that didn't make their numbers during the holiday rush go out of business.

But the most vexing problem is the credit markets. Although the Treasury and Federal Reserve have avoided the threatened meltdown, the survivors are in no mood to extend credit to very many people. The old saying that banks will lend to people who don't need the money, but will not give money to those who do, seems to be happening. It is more difficult to get credit cards, limits are being reduced and even home equity lines are being cut. Households and businesses alike are having a tough time getting loans.

Tight credit has harmed a number of major industries. Motor vehicle sales dropped to the lowest pace in twenty-five years. The evolving stabilization in the housing market was set back as

mortgage requirements stiffened.  Consumers are not spending and retailers, especially those selling big-ticket items, are reeling.

We have also come face to face with the downside of the globalization of the economy.  Those who thought a problem in the world's largest economy would not affect the rest of the world forgot to do some basic mathematics.  With large percentages of output from China, India and other parts of Asia ending up in the hands of U.S. consumers, a significant slowdown in our demand could only reverberate through the industrializing and industrialized nations' economies.  And it has.  Europe and Japan are in recession and Asia is not far behind and that has led to a significant slowdown in exports.  Since foreign demand was a major driving force keeping the U.S. economy going over the past year, that is worrisome.

### A deep recession is not inevitable
While the growth restraints are extensive, we don't have to fall into a depression.  There are already a variety of policies that have been implemented that taken together should keep the economy from collapsing.  These include the policies implemented and soon to be executed by the Federal Reserve, the Treasury, Congress and foreign Central Banks and governments.

The Federal Reserve has been as aggressive as it has ever been.  The FOMC has reduced the funds rate to 1.00% matching the low reached in 2003 when the deflation scare hit.  The Fed could cut rates further, to levels generally not seen since the 1950s when inflation was hardly a concern.  While the low rates are a help, it is not the level of rates that are the problem.  The real issue is the ability and willingness to lend on the part of major financial institutions.  The Fed is attacking that problem by adding significant amounts of liquidity to the system.

The Fed has also shored up the economy by becoming the market maker for commercial paper.  This has eased the funding problems of large banks.  It has shored up the inter-bank borrowing market by in essence, acting as the intermediary in the funds market.  It has done that by paying interest on reserves and easing the borrowing terms.  While we may be worried that the Fed has in essence become the invisible hand in the financial markets, there is at least a clearing house that is working.

The Treasury is doing its job as well.  Okay, Mr. Paulson may be making it up on the fly, but there are clear reasons for his actions.  The initial policy, the Troubled Asset Relief Program, was great in theory but totally flawed in reality.  The idea was that the Treasury would buy troubled mortgage assets from banks and that would accomplish a number of things.  First, it would add liquidity to institutions that were losing assets and capital rapidly.  This would stabilize the institutions.  It would also ease the future losses that would occur as falling home prices caused mark-to-market declines in mortgage back securities.  That was expected to shore up expected earnings and stock prices.

In addition, there was an unstated second part of the TARP plan which would directly help the faltering residential real estate market.  Once the government owned hundreds of billions of dollars of mortgages, they would be able to directly restructure those mortgages as the need arose.  Since it would have been politically impossible for the Treasury to foreclose on large numbers of homes, the aid to homeowners that has been sought would have come through the Treasury, not the private sector, accepting any losses.

Next there is fiscal policy, which is likely to be aggressively pursued once the new administration takes over.  Whether any package can pass during the lame duck session is unclear.  However, President Obama and the heavily Democratic Congress will undoubtedly pass a huge fiscal stimulus package.

The expected fiscal spending plan is likely to contain a wide variety of programs that would be short term as well as create spending over an extended period of time. It could add money into the economy immediately by extending unemployment benefits. But the lesson of the last stimulus bill is that there needs to be a long-term increase in demand and that will likely come through a massive infrastructure bill.

We also, finally, have the rest of the world focused on the problem. For way too long foreign governments and central banks argued that this was a U.S. problem and they did little. Suddenly, though, Europe and Asia woke up and discovered that their economies were crashing and burning and might even be in worse shape than the U.S. They have taken aggressive monetary and fiscal actions and a lot more is expected.

### Psychology could be the key

But the wild card in all of this economic turmoil is psychology. Households and business executives are all worried and are reacting accordingly. Confidence has hit record low levels as irrational despondence has replaced irrational exuberance.

The collapse of confidence has had real economic impacts. On the household side, even those who can spend are not doing so. Instead of shopping 'til they drop, people have largely dropped shopping. Household spending has fallen much more rapidly than would be expected given the unemployment rate. Those who are hitting the malls are buying cautiously and are looking for bargains. Only some discounters are doing okay.

Businesses have cut back as well. Uncertain about the length and depth of the recession, the better part of valor is to invest only in projects that need to be done and put off those can wait. Capital expenditures are down as a consequence and are likely to stay there until there is more clarity as to the extent of the recession.

Ultimately, the depression will wear off. People reasonably quickly learn to live with and accept difficult times. That is human nature. To paraphrase a line from Dr. Strangelove, we will likely learn to live with the recession, though I doubt we will learn to love it.

As time progresses and workers find they still have their jobs and income is still coming in, they will start asking a basic question: Why am I sacrificing so much? They will recognize that they can afford more than they are actually spending. That will start the process of recovery as consumption starts to pick up. The problem is we don't know when this will happen. It could be quite some time before attitudes change, so we will have some tough times to ride out. But that change in confidence will come and when it does, it is possible that rising confidence could lead to a surprisingly large increase in growth.

Similarly, businesses confidence will ultimately come around. Firms will start looking six to twelve months out and ask whether the time has come to ramp up the spending so they can be in position to take advantage of the upturn. And there is also the reality that in a globalized economy, firms have to remain competitive and can put off capital expenditures for only so long.

Finally, there is the housing market. In August, it appeared that sales had stabilized, housing starts were bottoming and even price declines in many places were moderating. The financial market meltdown in September and October, coupled with the sharp cut back in mortgage funds created a second leg down for this market.

Despite the continued problems in housing, there is hope that even this market could turn. Sales in some of the weakest markets are rising. While this may be due in no small part to foreclosures and "short sales", that is not necessarily bad. These sales are setting a bottom for prices. In addition, home prices are becoming much more affordable as they have receded close to 2003

levels. That is generating more interest that will ultimately turn into sales, especially when more mortgage money becomes available.

Hitting the bottom on prices is critical to the psychology of the housing market. Fairly soon, we are likely to see the year-over-year price drops slow and as that gets reported, hesitant buyers will start returning. And once sales start increasing, prices will not only stabilize but should start rising again. That would put behind us the worst aspect of this downturn, the decline in home prices that has created so much of the financial sector losses.

We are in for an extended period of very difficult economic times. Indeed, this is the first time anyone can remember where it is possible to reasonably construct a depression scenario. But barring a collapse of some key industries, with the implementation of additional timely fiscal and monetary policy, we should skirt the worst. But don't look for the return of strong growth until the end of next year, at the earliest.

### Regional Economic Growth: Any improvement will have to wait.
The economies in the region running from the New York City area south to Delaware have all faded. Growth during 2008 was spotty and even that has faded after the meltdowns in the markets. With layoffs on Wall Street and at the bankrupt and merged financial firms likely hitting the New York City and Northern New Jersey areas hard over the next year, the outlook is for significant weakness in those areas well into 2009. The Philadelphia/Southern New Jersey region should perform best and will likely mirror the nation. Delaware's economy may not match the Philadelphia area but it should outperform the weaker northern section.

The major uncertainty is how many jobs will be cut as a result of the Wall Street and bank chaos. Northern New Jersey and to a somewhat less extent Central New Jersey are at great risk as there are numerous employment centers for some of the firms that have been merged, are financially weakened or have gone bankrupt. At this point it is not clear how many jobs will be lost but it looks to be significant. Undoubtedly, a large amount of office space will be thrown on to the market and vacancy rates should rise while rents may fall.

In the Philadelphia region, the largest bank is in downsizing mode, a major regional bank is merging after its purchase in 2007 and another large regional bank was bought up after it nearly collapsed. All those changes are likely to lead to significant job cuts. However, the region is most dependent on medical care and education and the impact may be limited. The commercial real estate market will likely experience "normal" cyclical effects rather than the major negative impacts felt in the greater New York region.

In Delaware, the closing of an assembly plant in Newark will begin in 2009 and that will remove a significant number of positions over a two year period. Given the condition of the vehicle sector, it would not be surprising to see the schedule accelerated. The state's economy will suffer but that may not lead to a large impact on the commercial real estate market. Much of the downsizing in the key financial sector has already occurred from previous mergers. Undoubtedly, cut backs will occur as questions about potential problems with consumer credit abound, but the risk to the Wilmington market is less than it would have been in the past.

The slowing of the economy has already led to major problems for the region's governments. Short-falls in revenues are piling up. To this point, only modest numbers of state and local government layoffs have been announced, but that will probably change. The downsizing is likely to come through job freezes and attrition. With revenues a number of percentage points below estimates made just a few months ago and with the outlook clouded by the exposure to the financial sector, the public sector will need to react quickly if it is to stave off major problems in this and the next fiscal years. New budget analyses are already under way, hearings are occurring and we are only waiting for the politically difficult decisions to be made.

The forecast for the next year is for uneven growth across the region at least until mid-2009. Southern New Jersey and the Pennsylvania portion of the Philadelphia metropolitan area should be soft but not overly weak. Somewhat improved activity should be seen in the second half of 2009. Delaware will likely remain mediocre all through next year. The real worry is Northern New Jersey and parts of Central New Jersey, which may not recover until spring 2010.



# Tactical Plan (through December 2009)

For Spectrum's portfolio (fee simple ownership) as of September 30, 2008, the following summarizes planned activity and major milestones through the end of 2009:

**Pennsylvania Properties:**

## Allen Forge Shopping Center:

Description: 51,000 square foot neighborhood retail center; Lansdale, PA.

Allen Forge had one vacancy as of 9/30/08, representing 3% of gross leasable area. Our plans for the project include the continuation of modest capital improvements (signage replacements, tenant space upgrades, etc) and the target of 100% occupancy. Demand for space at this neighborhood center has been vibrant based on good tenant mix and strong surrounding demographics.

Major milestones: None.

## Gwynedd Corporate Center:

Description: 122,803 square foot, three-building office complex; North Wales, PA.

Gwynedd's ten year operating history has been marked by steady occupancy, with occasional tenant rollover. As of 9/30/08, Gwynedd stood at 80% occupancy, although several tenant prospects in the 4th quarter of 2008 represent an opportunity to increase that total to the 93-95% range. With the oldest building now ten years old, management will continue a careful capital improvement analysis to ensure the asset is maintained as a Class A complex.

Major milestones: Energy Star ratings anticipated for three building complex in 2009. John Hancock financing on 1120 & 1140 Welsh Road matures in 2012. Refinancing will be considered subject to the cost-benefit analysis of the prepayment penalty.

## Hawthorne Court:

Description: 13-acre land parcel approved and permitted for 120,000 square feet of offices; also zoned for retail; Montgomery Township, PA.

Hawthorne has received full approvals and permitting for its office use, and its entrance has been constructed, including a full-service traffic signal. For the coming year, we are keeping watch on the progress of the Route 202 Parkway, a $200 million infrastructure project that is planned to start construction in December 2008. This highway will be a great benefit to central Montgomery County, and its Southern terminus will be one block from Hawthorne Court. Also under consideration are possible retail uses at the site. With Montgomeryville one-half mile to the East, the area is a retail stronghold, and Spectrum will consider retail applications (which are permitted by zoning) to the extent pre-leasing anchors are identified.

Major milestones: Route 202 Parkway construction commencing December 2008.  It is possible that we will seek land development approval revisions to accommodate retail uses. Depending on pre-leasing, construction financing may be sought in 2009.

### The Fairway Offices:

Description: 5-acre land parcel, fully approved and permitted for 50,000 square foot, 3-story office building; Montgomery Township, PA.

Fairway will benefit from the Route 202 Bypass noted under Hawthorne's summary above, although the project is about one mile farther from access to the new road.  We have received interest from several medical office users, seeking both purchase and lease scenarios.  We will pursue both avenues in 2009.

Major milestones: None, until user / buyer identified.

### Hillcrest Shopping Center:

Description: 140,000 square foot grocery-anchored retail center; Lansdale, PA.

Hillcrest has one retail vacancy, representing approximately 1.25% of the gross leasable retail area of the center (there is also a 6,000 square foot second story office space that is available). We will seek to tenant this space, while furthering redevelopment plans for the overall project. With anchor tenancy lease expirations in 2015-16, we are eyeing that timeframe for a façade retrofit and a significant redevelopment effort.  We have already begun work on architectural drawings for that project and are evaluating adjacent land acquisitions to enable center expansion.

Major milestones: None.

### Towamencin Corporate Center:

Description: 78,000 square foot, three-story office building, 21,000 square feet of ancillary retail space and a finished building pad allowing for another 88,000 square foot office building; Lansdale, PA.

Office leasing at Towamencin Corporate Center has been modest, but steady.  User demand has primarily come from local or regional companies seeking 5-year leases in the 2-10,000 square foot range.  We will continue to seek tenants for the property in 2009, targeting 85% or greater occupancy in 2009.  The retail component has leased well, with the restaurant and bank pads leased under long term contracts, and with one vacancy remaining in the multi-tenanted space.  The construction of the second office building will commence upon the achievement of significant pre-leasing.  While we have fielded smaller tenant prospects for the 1690 Sumneytown Pike building, the area has seen some large-user activity that bodes well for the 1670 Sumneytown Pike project.  Two relevant examples include the SKF headquarters building (120,000 square feet) and the Almac North American headquarters building (240,000 square feet), under construction in the immediate market.

Major milestones: Continuing lease-up; ongoing PA Turnpike expansion project.  Permanent financing expected for both 1690 Sumneytown Pike and Tollgate Commons (retail) during 2009.  The latter will likely be accomplished through a "mini-perm" loan already structured as part of the existing facility with Continental Bank (the construction lender).

**New Jersey Properties:**

**Cedar Hill Shopping Center:**

Description: 450,000 square foot power shopping center; Voorhees, NJ.

Cedar Hill Shopping Center has been expanded through four acquisitions, with the latest expansion derived from the contract to acquire ten acres of land from Ventura's Restaurant and Bar. The center will see additional tenant openings in 2009, including the planned fourth quarter opening of Lowe's and the 2009 construction of the 12,000 square foot multi-tenanted pad in front of BJ's. The ongoing construction of Virtua's healthcare campus will have a substantive impact on the center in 2009 and beyond.

Major milestones: Lowe's opening (4Q/09); Ventura approvals (4Q/09); Virtua construction (ongoing through 2011). Permanent financing anticipated for Lowe's, A.C. Moore and other components during 2nd half of 2009.

**Mount Laurel Corporate Park:**

Description: 87,000 square foot, three-story office building; Mount Laurel, NJ.

Leasing at Mt. Laurel has been very active since opening, and we expect to exceed 90% occupancy during 2009. Activity through 12/09 is expected to revolve around that leasing effort and the associated tenant improvements for those tenants.

Major milestones: With occupancy surpassing 80%, we anticipate closing on a permanent loan during 2009. Our expectation is that the loan will be best identified in Q2/Q3 of 2009, to allow added time for the financial markets to stabilize.

**Delaware Property:**

**The Commons at Little Falls:**

Description: 229,000 square feet of Class A office in three buildings (26,000 square feet constructed thus far) plus two ancillary retail pads totaling 16,000 square feet (both leased and under construction); Wilmington, DE.

Phase I construction will be complete by the first quarter of 2009. Additional buildings will be constructed as appropriate based on pre-leasing. Tenant prospects consist primarily of larger users, requiring 20-200,000 square feet in size.

Major milestones: Honda took occupancy in November 2008, Figs & Olives in January 2009 and Children of America in May 2009. A permanent loan will be sought for "Phase I" in 2009, with a corresponding paydown of the construction loan.

**Acquisition targets**

1)  **17-acre retail property - Washington Twp., New Jersey:** Closing on this property has been delayed due to the prolonged process of changing the property's zoning. With the zoning issue resolved during 2008, we have now executed an extension to the agreement of sale that will allow closing to occur on or before mid-2010. During that timeframe, we will seek full land development approvals for a 130,000 +/- square foot shopping center. The property is located in a fast-growing township in Southern New Jersey, and its access to Center City Philadelphia will be improved as the nearby interchange with the Atlantic City

Expressway is upgraded. **Holding costs remain low due to the contingent nature of the purchase contracts.**

2) <u>18-acres of land - Lehigh Valley, Pennsylvania:</u>  We have signed agreements of sale for three parcels within the Stabler Corporate Center. The smaller parcel (3 acres) is expected to close in early 2009. We will seek to achieve at least 35% pre-leasing before commencing the approved 35,000 square foot office building on this lot. The other two lots (contiguous) are expected to gain approvals and permits for up to 170,000 square feet in early 2009. Closing is set to occur later in 2009. Construction will commence based on pre-leasing activity. **Holding costs remain low due to the contingent nature of the purchase contracts.**

3) <u>50-acre retail parcel – Eastern Shore, Maryland:</u>  This land is zoned for retail development, and will accommodate an approximately 400,000 square foot shopping center in the rapidly growing Eastern Shore market. We will look to execute an agreement of sale for the property in late 2008 or in 2009. **Holding costs remain low due to the contingent nature of the purchase contracts under negotiation.**

4) <u>Ventura Tract – Voorhees, NJ:</u> This 10-acre parcel is adjacent to the Cedar Hill Shopping Center. We intend to use the land to expand Cedar Hill by 60-80,000 square feet. Approvals will be sought during 2009 and State permitting (particularly NJDOT) will be pursued during that same timeframe. Closing is not expected until 2010 at the earliest. **Holding costs remain low due to the contingent nature of the purchase contracts.**

## GENERAL INFORMATION

### REPORTING

> *Limited Partners' K-1's:* to be delivered upon their completion by Spectrum Alliance's
> outside accounting firm, Asher & Company, Ltd. Year-end tax reporting is
> expected by March 15th of the following year.
>
> *Spectrum Alliance year-end financial statements:* available upon their completion by
> the accounting firm, Asher & Company, Ltd. Completion is expected to occur
> on or before March 31st of each year. If financial reports are desired, please
> submit your request to the Partnership in writing.
>
> *Annual Meeting of the Investors:* Spectrum Alliance will hold its annual meeting in
> the fall (date to be determined).
>
> *Quarterly Status Reports to Investors:* to be delivered approximately one month
> following the end of each calendar quarter.

VALUATION PARAMETERS (GENERAL ASSUMPTIONS FROM INSTITUTIONAL SOURCES)

### Korpacz / Price
### Waterhouse Third
### Quarter 2008 Survey

| | Office (Nat'l Suburban) | Strip Retail |
|---|---|---|
| **Discount Rates (range)** | 7.00% - 12.50% | 6.00% - 10.00% |
| Korpacz Avg. | 8.93% | 8.39% |
| Spectrum assumption | 8.25 – 9.25% | 8.25 – 9.25% |
| **Residual Cap Rates (range)** | 6.00% - 11.00% | 6.00% - 10.00% |
| Korpacz Avg. | 7.93% | 7.89% |
| Spectrum assumption | 8.25 - 8.75% | 8.00 - 8.50% |
| **Going-in Cap Rates (range)** | 5.00% - 10.50% | 5.80% - 9.00% |
| Korpacz Avg. | 7.34% | 7.33% |
| Spectrum assumption | 7.25 - 8.00% | 7.00 - 8.00% |
| **Structural reserve (range)** | $0.10 - 0.25 | $0.10 - 0.30 |
| Korpacz Avg. | $0.20 | $0.15 |
| Spectrum assumption | $0.20 - 0.25 | $0.20 - 0.25 |

Specific assumptions are subjectively determined by the age, size, condition, location and tenancy of a particular property.

## CONSULTANTS

| | |
|---|---|
| **Accounting (General):** | Asher & Company, Ltd., Philadelphia, PA |
| **Legal (General):** | Drinker Biddle & Reath, LLP, Philadelphia, PA |
| **Legal (NJ – land use):** | Dilworth, Paxon, LLP, Cherry Hill, NJ |
| **Legal (NJ – land use):** | Drinker Biddle & Reath, LLP, Florham Park, NJ |
| **Legal (PA – land use):** | Wisler, Pearlstine, Garrity, et al, Norristown, PA |
| **Legal (DE – land use):** | Saul Ewing, LLC, Wilmington, DE |
| **Approvals Consultant:** | Tudor Development (Stephen R. Jaffe), Delran, NJ |
| **Architect:** | Cathers & Associates, Inc., Malvern, PA |
| **Architect:** | Cubellis Associates, Inc., Philadelphia, PA |
| **Engineer (PA & NJ):** | Bohler Engineering, Inc., Chalfont, PA |
| **Engineer (NJ):** | Abbington Associates, Inc., Freehold, NJ |
| **Engineer (DE):** | Landmark Engineering, Inc., New Castle, DE |
| **Environmental Legal (DE):** | Manko, Gold, Katcher & Fox, LLP, Bala Cynwyd, PA |
| **Environmental Eng (DE):** | Malcolm Pirnie, Inc., Wilmington, DE |
| **Construction Mgmt:** | Berks Ridge Company Enterprises, Inc., Lansdale, PA |
| **Construction Mgmt:** | The Norwood Company, West Chester, PA |
| **Leasing (office-PA/DE):** | GVA Smith Mack, Wayne, PA and Wilmington, DE |
| **Leasing (office-NJ):** | Grubb & Ellis Company, Marlton, NJ |
| **Leasing (retail-NJ):** | Legend Properties, Mount Laurel, NJ |

## ADVISORY BOARD MEMBERS

### INSIDE MEMBERS (TREFOIL PROPERTIES, LP)

| | |
|---|---|
| Robert T. Wrigley | President, Trefoil Properties GP, LLC<br>Manager and President of Trefoil Management, LLC |
| James R. Wrigley | Exec. Vice President, Trefoil Properties GP, LLC<br>Exec. Vice President, Trefoil Management, LLC |
| John P. Lloyd, Esquire | SVP, General Counsel, Trefoil Properties GP, LLC<br>Former Partner, Drinker Biddle & Reath, Philadelphia |
| David J. Friesen, CPA | SVP, CFO of Trefoil Properties GP, LLC, formerly<br>the CFO of Clemens Markets |
| Ramesh R. Desai (Guest) | former CFO of Trefoil Properties, Inc., consultant to<br>Trefoil Properties GP, LLC |
| Richard A. Watson, Jr. CPA | SVP, Gooding Group, LLC, Lancaster, PA,<br>Advisor & owner, Trefoil Properties, LP |

### OUTSIDE MEMBERS

| | |
|---|---|
| Peter D. Linneman, PhD | Principal, Linneman Associates |
| Joel Naroff, PhD | Principal, Naroff Economic Advisors |
| Milton A. Feldman, Esquire | Former Partner, Dilworth, Paxson, LLP |
| Georgina MacDonald | President, Morgan Group, LLC |
| Arthur M. Mitchell, Esquire | General Counsel of the Asian Development Bank |
| Burkhart A. Schulz | Principal of IIC International Investment Consultants |
| Jon Greer | Principal, GSG Advisors |
| Michael D. Byrnes | Director, Asher & Company, Ltd. |

EXECUTION

# AMENDED AND RESTATED

# AGREEMENT OF LIMITED PARTNERSHIP

# OF

# SPECTRUM ALLIANCE, LP

THE PARTNER INTERESTS IN SPECTRUM ALLIANCE, LP HAVE NOT BEEN
REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER ANY
APPLICABLE STATE SECURITIES LAW, AND MAY NOT BE TRANSFERRED,
ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH ALL
APPLICABLE SECURITIES LAWS. THE PARTNER INTERESTS ARE ALSO
SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER UNDER THIS
AGREEMENT OF LIMITED PARTNERSHIP.

Page

ARTICLE I:        DEFINITIONS.................................................................................. 1
ARTICLE II:       FORMATION OF PARTNERSHIP ............................................ 8
       Section 2.1    Formation of Partnership. .......................................... 8
       Section 2.2    Name, Principal Place of Business and Registered Office. ........ 9
       Section 2.3    Purpose. ...................................................................... 9
       Section 2.4    Powers. ........................................................................ 9
       Section 2.5    Term. .......................................................................... 10
       Section 2.6    Filing of Certificate and Amendments Thereto. .............. 10
       Section 2.7    Partnership Assets ................................................... 10
       Section 2.8    Limitation on Liability of Persons Related to Partners..... 10
       Section 2.9    Conflicts of Interest and Transactions with Affiliates. .... 11
ARTICLE III:      PARTNERSHIP INTERESTS .................................................. 11
       Section 3.1    In General.................................................................. 11
       Section 3.2    Class A and Class B Limited Partner Interests. ........... 12
       Section 3.4    Other Provisions Relating to All Classes of Partnership
                      Interests .................................................................... 13
       Section 3.5    Register. .................................................................... 13
       Section 3.6    Preemptive Rights..................................................... 13
ARTICLE IV:       CONTRIBUTIONS TO CAPITAL AND ISSUANCES OF
                  PARTNERSHIP INTERESTS................................................ 14
       Section 4.1    General Partner Capital Contributions ..................... 14
       Section 4.2    Initial Limited Partner Capital Contributions ............ 14
       Section 4.3    Capital Contributions Generally ............................... 14
       Section 4.4    Units .......................................................................... 14
       Section 4.5    No Third Party Beneficiary....................................... 14
ARTICLE V:        CAPITAL ACCOUNTS ........................................................... 15
       Section 5.1    Establishment and Maintenance of Capital Accounts ...... 15
       Section 5.2    Succession to Capital Accounts ................................ 15
       Section 5.3    Certain Adjustments................................................. 15
ARTICLE VI:       DISTRIBUTIONS ................................................................... 16
       Section 6.1    Distributions of Net Operating Proceeds and Net Capital
                      Proceeds ................................................................... 16
       Section 6.2    Distributions to Pay Taxes ....................................... 16
       Section 6.3    Distributions upon Liquidation ................................ 17
       Section 6.4    Additional Distribution Rules ................................... 17
       Section 6.5    Taxes Withheld ...:.................................................... 17
       Section 6.6    In-Kind Distributions................................................ 18
ARTICLE VII:      ALLOCATIONS....................................................................... 18
       Section 7.1    Allocation of Net Income and Net Loss .................... 18
       Section 7.2    Special Allocations ................................................... 20
       Section 7.3    Tax Allocations ........................................................ 21
       Section 7.4    Election of Liquidation Value Safe Harbor ............... 22
ARTICLE VIII:     EXPENSES; POWERS OF THE GENERAL PARTNER;
                  MEETINGS ............................................................................. 21

Page

Section 8.1    Expenses Borne by the Partnership.....................................................22
Section 8.2    Powers and Duties of General Partner ............................................22
Section 8.3    Proscriptions ......................................................................................25
Section 8.4    Additional Partners ...........................................................................26
Section 8.5    Compensation of the General Partner. ..............................................26
Section 8.6    Waiver and Indemnification ..............................................................26
Section 8.7    Reliance by Third Parties ..................................................................27
Section 8.8    Other Matters Concerning the General Partner. ...............................27
Section 8.9    Meetings of Partners .........................................................................28
ARTICLE IX:    ACCOUNTING AND RECORDS ...........................................................29
Section 9.1    Books and Records ............................................................................29
Section 9.2    Annual Business Plans .......................................................................29
Section 9.3    Annual Reports ..................................................................................30
Section 9.4    Tax Returns ........................................................................................31
Section 9.5    Fiscal Year .........................................................................................31
Section 9.6    Bank Accounts ...................................................................................31
ARTICLE X:    CHANGES IN GENERAL PARTNERS .................................................31
Section 10.1    Permitted Assignment of General Partner Interest; Permitted
                Withdrawal by the General Partner. ..................................................31
Section 10.2    Admission of Additional General Partners ......................................31
Section 10.3    Effect of Withdrawal of General Partner. ........................................32
Section 10.4    Liability of a Withdrawn General Partner ........................................32
ARTICLE XI:    TRANSFERS OF LIMITED PARTNER INTERESTS ...............................32
Section 11.1    General Transfer Provisions and Restrictions...................................32
Section 11.2    Expenses ............................................................................................34
Section 11.3    Allocations with Respect to Transferred Interest..............................34
Section 11.4    Section 754 Election ..........................................................................34
Section 11.5    Transferee's Rights. ...........................................................................34
ARTICLE XII:    ADMISSION OF PARTNERS................................................................35
Section 12.1    Procedure ...........................................................................................35
ARTICLE XIII:    DISSOLUTION, LIQUIDATION AND WINDING-UP.........................35
Section 13.1    Events of Dissolution ........................................................................35
Section 13.2    Continuation of the Business of the Partnership After Certain
                Events of Dissolution. ......................................................................36
Section 13.3    Effect of Event of Dissolution ..........................................................36
Section 13.4    Accounting.........................................................................................37
Section 13.5    Distribution on Dissolution ...............................................................37
Section 13.6    Timing Requirements.........................................................................37
Section 13.7    Sale of Partnership Assets. ................................................................37
Section 13.8    Distributions in Kind.........................................................................38
Section 13.9    Documentation of Liquidation...........................................................38
Section 13.10    Liability of the Liquidating Trustee ..................................................38
ARTICLE XIV:    RIGHTS AND OBLIGATIONS OF THE LIMITED PARTNERS..............39
Section 14.1    No Participation in Management .......................................................39
Section 14.2    Death, Incompetence, Bankruptcy, Etc.............................................39

|  |  | Page |
|---|---|---|
| Section 14.3 | No Withdrawal | 39 |
| Section 14.4 | Power of Attorney | 39 |
| Section 14.5 | Limited Liability of Limited Partners | 40 |
| ARTICLE XV: | LIMITED PARTNER REPRESENTATIONS AND WARRANTIES | 40 |
| Section 15.1 | Representations and Warranties of the Limited Partners | 40 |
| ARTICLE XVI: | GENERAL PARTNER REPRESENTATIONS AND WARRANTIES | 41 |
| Section 16.1 | Organization | 41 |
| Section 16.2 | Due Authorization; Binding Agreement | 42 |
| Section 16.3 | Consents and Approvals | 42 |
| ARTICLE XVII: | GENERAL PROVISIONS | 42 |
| Section 17.1 | Notices | 42 |
| Section 17.2 | Successors | 42 |
| Section 17.3 | Effect and Interpretation | 42 |
| Section 17.4 | Counterparts | 42 |
| Section 17.5 | Partners Not Agents | 43 |
| Section 17.6 | Entire Understanding; Etc | 43 |
| Section 17.7 | Amendments | 43 |
| Section 17.8 | Severability | 44 |
| Section 17.9 | Interpretation | 44 |
| Section 17.10 | Assurances | 44 |

<u>EXHIBITS</u>

Exhibit A          List of Partners
Exhibit B          Initial Annual Business Plan

<u>SCHEDULES</u>

Schedule 2.9(b)          Fees and Compensation to be paid to the Partners and their Affiliates

-i-

### FIRST AMENDMENT TO THE
### AMENDED AND RESTATED AGREEMENT
### OF LIMITED PARTNERSHIP OF SPECTRUM ALLIANCE, LP

THIS FIRST AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP OF SPECTRUM ALLIANCE, LP (this "First Amendment") is made as of January 1, 2008, by Spectrum Alliance Services GP, LLC, a Pennsylvania limited liability company, as the sole General Partner (the "General Partner").

### BACKGROUND

As of January 1, 2006, the Partners of Spectrum Alliance, LP (the "Partnership") entered into the Amended and Restated Agreement of Limited Partnership of Spectrum Alliance, LP (as heretofore amended, the "Partnership Agreement"). The Partnership Agreement is incorporated herein by this reference, and all terms defined therein and not otherwise defined herein shall have the same meanings in this First Amendment as are respectively ascribed to them in the Partnership Agreement.

The General Partner, acting pursuant to the Partnership Agreement, has determined that the Partnership Agreement should be amended in certain respects as more particularly described below and is executing this First Amendment in order to effectuate such amendments effective as of the date hereof.

NOW, THEREFORE, the General Partner, acting pursuant to the Partnership Agreement and in consideration of the mutual covenants contained herein and therein, agrees as follows:

1.  _Amendment to the Partnership Agreement_.  Effective as of the date hereof, the Partnership Agreement is amended by deleting Schedule 2.9(b) to the Partnership Agreement and replacing the same with Revised Schedule 2.9(b) attached hereto and made a part hereof.

2.  _Effect of this First Amendment_.  Except as expressly amended hereby, the Partnership Agreement remains in full force and effect in accordance with its terms. The First Amendment is executed by the General Partner pursuant to Section 17.7 of the Partnership Agreement.

IN WITNESS WHEREOF, the General Partner has caused this First Amendment to be duly executed the day and year first above written.

> **SPECTRUM ALLIANCE SERVICES GP, LLC,**
> a Pennsylvania limited liability company
> By:  TREFOIL PROPERTIES, LP, a Delaware limited
> partnership
> By:  TREFOIL PROPERTIES GP, LLC, a Delaware
> limited liability company, its sole General Partner
>
> By:  _____
> Title: Manager

## REVISED
### Schedule 2.9(b)

FEES AND COMPENSATION TO BE PAID TO

THE PARTNERS AND THEIR AFFILIATES


       The fees and compensation which may be paid to the Partners or their Affiliates, are to be paid to the Partners or such Affiliates in consideration for services performed by them for or on behalf of the Partnership and in connection with the business, properties and assets of the Partnership, as follows:

| | |
|---|---|
| Annual Asset Management Fee: | The Class B Limited Partner, Trefoil Properties, LP ("TPLP"), shall be paid an annual Asset Management Fee equal to 0.65% of the gross asset value of the Partnership's assets, determined annually, such fee to be paid monthly in arrears. |
| Acquisition Fee: | TPLP or an Affiliate thereof shall be paid an acquisition fee equal to 0.50% of the acquisition price of each Property acquired by the Partnership, including acquisitions of partnership interests in a project partnership, such fee to be paid at the time of acquisition. |
| Property Management Fee: | To be paid to TPLP or an Affiliate thereof at market rates, which, upon the date hereof, would be no greater than at an annual rate equal to 4.0% of the gross revenues received by the Partnership (or a project partnership) from a Property. |
| Leasing Commissions: | The Partnership will pay leasing commissions at market rates to real estate brokers identifying tenants for any Property. An Affiliate of a Partner will be entitled to receive its share of such commissions if it is either the listing or cooperating broker in the transaction. |
| Insurance Fees: | The Partnership and each project partnership intend to place all insurance coverages pursuant to a competitive bidding process. Affiliates of a Partner which provide such services will be permitted to participate in such process and, if selected, to receive fees for such services at market rates. |
| Capital Events Fee: | TPLP and Affiliates thereof hold the General Partner interest and the Class B Limited Partnership Interest in |

exchange for its services or the services of its Affiliates in acting as the General Partner of each Property Partnership and the Partnership, with TPLP and Affiliates thereof receiving for those services a fee equal to 12.5% of all Net Capital Proceeds after (in the event of a Portfolio Sale only) return of all Class A Limited Partners Cash Capital Accounts, with TPLP and Affiliates having no interest in and receiving no fee with respect to all current (i.e., non-capital event) proceeds.

Pre-Development Fee:

TPLP or its Affiliates, will be paid a pre-development fee equal to 1.00% of the "as developed" value of a project, such fee to be paid on a monthly basis or as otherwise reasonably determined by the General Partner prior to the start of construction.

Development Fee:

TPLP or its Affiliates will be paid a development fee equal to 4.5% of total development cost of each Partnership project, such fee to be paid as such costs are incurred commensurate with construction loan funding.

Fee for Legal Services:

TPLP's inside counsel staff performs legal services for the Partnership and the Properties, and the cost of those services, on an hourly basis which the General Partner determines to be fair and reasonable, are charged to the Partnership or the particular project. In addition, the General Partner will retain outside counsel as necessary, and the fees of such outside counsel shall be charged to the Partnership or the particular project, as applicable.