**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

In re:                                          :        Chapter 11

Spectrum Alliance, LP,                          :

          Debtor.                               :        Bankruptcy No.  17-14250-MDC

# MEMORANDUM

## I.    INTRODUCTION

Pending before the Court is the objection (the "Claim Objection") of Miller Coffey Tate LLP, as Plan Administrator (the "Plan Administrator"), to the claim filed by the International Union of Operating Engineers Pension (the "Pension" and together with the Plan Administrator, the "Parties") against Spectrum Alliance, LP (the "Debtor"), in the amount of $11,200,000.00, based on a guaranty (the "Guaranty") by the Debtor in favor of the Pension (the "Pension Claim").  The Plan Administrator asserts that the Pension Claim is subject to mandatory subordination pursuant to §510(b) of the United States Bankruptcy Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), because it is a claim arising from the purchase of a security of the Debtor's affiliate, PB Spectrum Partners, LP ("PB Spectrum Partners" or the "Partnership").

For the reasons set forth herein, the Court will overrule the Claim Objection because the Pension Claim does not arise from the purchase of a "security" of the Partnership as defined by §101(49)(A) of the Bankruptcy Code, which is a threshold requirement for subordination under §510(b).[1]

---

[1] The Court has jurisdiction over resolution of the Claim Objection pursuant to 28 U.S.C. §§ 157(b)(2)(B) and 1334.

## II.    PROCEDURAL BACKGROUND

On June 20, 2017 (the "Petition Date"), the Debtor filed a voluntary chapter 11

bankruptcy petition.  On August 15, 2017, the Pension filed the Pension Claim. [2]  On January 25,

2021, the Plan Administrator filed the Claim Objection.[3]  On March 22, 2021, the Pension filed a

response to the Claim Objection (the "Response"),[4] and on April 1, 2021, the Plan Administrator

filed a reply (the "Reply").[5]

On April 9, 2021, the Court held a hearing (the "Initial Hearing") on the Claim Objection,

at which time the Court continued the hearing and gave the Pension additional time to file a sur-

reply to respond to positions the Plan Administrator took for the first time in the Reply.  On

April 19, 2021, the Pension filed a sur-reply (the "Sur-Reply"),[6] and on April 30, 2021, the Court

held a continued hearing (the "Continued Hearing," and together with the Initial Hearing, the

"Hearing") on the Claim Objection.  At the close of the Continued Hearing the Court took the

matter under advisement in order to consider the issues raised by the Claim Objection, the

Response, the Reply, the Sur-Reply (collectively, the "Pleadings"), and the Parties' arguments at

the Hearing.

## III.    FACTUAL BACKGROUND[7]

Sometime in December 2015 or January 2016, the Pension made an investment of

---

[2] Proof of Claim No. 24.

[3] Bankr. Docket No. 486.

[4] Bankr. Docket No. 525.

[5] Bankr. Docket No. 531.

[6] Bankr. Docket No. 548.

[7] The factual background described herein is taken from the Pleadings and the exhibits admitted into evidence at the Hearing.

$10,000,000.00 (the "Investment") in PB Spectrum Partners.[8]  The Amended and Restated

Limited Partnership Agreement of PB Spectrum Partners (the "LP Agreement") provides that the

purpose of the Partnership is to "own, hold, develop, mortgage and sell an interest in a parcel

known as the Pond Building (Unit 6) of the Kulpsville Business Campus located in Towamencin

Township, Montgomery County, Pennsylvania (the 'Property') and engaging in any and all

lawful activities necessary or incidental to the foregoing."[9]  The Pension alleges the Property

was the primary asset of the Partnership, while the Trustee alleges it was the only asset of the

Partnership.[10]

The LP Agreement refers to the Investment as a capital contribution.[11]  The Guaranty and

Suretyship Agreement (the "Guaranty Agreement") refers to the Investment as a preferred equity

investment.[12]  While the Parties dispute the precise nature of what the Pension received in

exchange for its Investment, they do not dispute that the Pension was admitted as a Class PE

Partner in the Partnership and obtained a Class PE Partner Interest.[13]

The LP Agreement and the Guaranty Agreement each speak to this.  The LP Agreement

---

[8] The precise date of the Investment is unclear from the Pleadings and the exhibits.  The Guaranty Agreement, dated as of an unspecified date in December 2015, states at paragraph A that the Investment was made "contemporaneously herewith."  Pension Ex. 3, Guaranty Agreement, at ¶A.  The LP Agreement, however, is dated January 27, 2016, and in its Response the Pension states that "On or about January 27, 2016, [the Pension] made [a] $10,000,000.00 capital contribution in a limited partnership known as PB Spectrum Partners, LP becoming the sole Class PE Partner in PB Spectrum Partners, LP." Response, at ¶8.  Whether the Investment was made in December 2015 or January 2016, however, does not impact the Court's analysis of the Claim Objection.

[9] LP Agreement, at §2.02.

[10] Response, at ¶11; Reply, at ¶52.

[11] LP Agreement, at §3.01(b).

[12] Guaranty Agreement, at ¶A.

[13] Response at ¶2; Reply at ¶13.

recites that SAS-PB, LLC ("SAS-PB"), as the Partnership's sole general partner, and the Debtor, as its sole limited partner, desired to "provide for the creation of a Class PE Partner Interest and the admission of the Class PE Partner as a Limited Partner holding a Class PE Partner Interest."[14]  The term "Class PE Partner" is defined to mean "[e]ach person holding a Class PE Partner Interest," and the term "Class PE Partner Interest" is defined to mean "the Partnership Interest issued to and held by the Class PE Partner pursuant to Section 3.01 and as set forth on Annex A."[15]  Section 3.01, in turn, provides that "in exchange for a capital contribution of $10,000,000, [PB Spectrum Partners] hereby issues the Class PE Partner Interest to the Class PE Partner, and the Class PE Partner is hereby admitted as a Partner of [PB Spectrum Partners] holding the Class PE Partner Interest."  The LP Agreement is signed by SAS-BP as General Partner, the Debtor as Limited Partner, and the Pension as Class PE Partner, and Annex A to the LP Agreement identifies the Pension as the sole Class PE Partner.  Likewise, the Guaranty Agreement recites that in exchange for the Investment, the Pension "as Class PE Partner, has received a 'Class PE Partner Interest' (as defined in the [LP Agreement])."[16]

The Pension's distribution rights with respect to its Investment were set forth in §4.06(b) of the LP Agreement, which provided for a waterfall of payments of "Available Cash" that entitled the Pension to (a) quarterly payments equal to 12% per annum until the redemption of its Investment (the "Quarterly Payments"), and (b) the redemption of its Investment (the

---

[14] LP Agreement, at third Recital paragraph.

[15] LP Agreement, at §1.01.

[16] Guaranty Agreement, at ¶A.  The Assignment Agreement (discussed *infra*) included a "Whereas" paragraph stating that the Pension "contributed $10,000,000 to the Partnership and was admitted as a limited partner with a Class PE Partner Interest in the Partnership."  Pension Ex. 6, Assignment Agreement.

"Redemption"), before any remaining Available Cash could be distributed to SAS-PB or the Debtor.

The LP Agreement also provided for a security interest in favor of the Pension. Pursuant to §4.12(a), SAS-PB and the Debtor pledged their Partnership Interests in PB Spectrum Partners (the "Pledged Interests") to and for the benefit of the Pension as security for the payment of the amounts due to the Pension as the Class PE Partner.[17] In the event a Quarterly Payment was not made when due or the Redemption did not occur when required, subject to 30 days written notice (a "Default Notice") from the Pension to SAS-PB, (a) the unpaid Quarterly Payment would bear interest at 12% per annum until paid; (b) the Pension had the right to remove SAS-PB as general partner of PB Spectrum Partners and to appoint a replacement, with SAS-PB being deemed to assign its general partner interest to the Pension's designee; and (c) the Pension had the right to remove the Debtor and to cause the Debtor to be withdrawn as a Partner, in which event the Debtor would be deemed to have assigned its partnership interest to the Pension.[18]

The Parties agree that, in addition to granting the Pledged Interests as security for the Pension's Investment, the Debtor's entry into the Guaranty was an inducement for the Pension to make the Investment,[19] and the Guaranty Agreement itself states that it is to induce the Pension to make the Investment.[20] Pursuant to the Guaranty, the Debtor and its principal guaranteed payment of each Quarterly Payment in the amounts and at the times called for by the LP Agreement, as well as payment of the Redemption when due.

---

[17] LP Agreement, at §4.12(a).

[18] LP Agreement, at §4.12(b).

[19] Claim Objection, at ¶14; Response, at ¶2.

[20] Guaranty Agreement, at "Now, Therefore" paragraph on first page.

On May 30, 2017, the Pension provided SAS-PB with a Default Notice, notifying it that PB Spectrum Partners was in default of its Quarterly Payment obligations to the Pension under the terms of the LP Agreement, and unless the default was cured within 30 days, the Pension would demand the withdrawal of the Debtor as a limited partner of the Partnership and the assignment of the Debtor's partnership interest to the Pension.[21]  Thereafter, on June 13, 2017, the Partnership, SAS-PB as General Partner, the Debtor as Limited Partner, and the Pension as Class PE Partner, each entered into an agreement (the "Assignment Agreement") providing, *inter alia*, for the immediate withdrawal of the Debtor as a partner in the Partnership and assignment of the Debtor's partnership interest in the Partnership to the Pension (the "Assignment").[22]  The Assignment Agreement also provided for the amendment of Annex A to the LP Agreement to replace the Debtor as limited partner, holding a 99.9% interest, with the Pension.[23]

On November 18, 2018, the Pension provided SAS-PB with a second Default Notice, notifying it that PB Spectrum Partners continued to be in default of its Quarterly Payment obligations to the Pension, and exercising its right under the LP Agreement to remove SAS-PB as the general partner of the Partnership, effective immediately.[24]

## IV.   DISCUSSION

As noted *supra*, the Plan Administrator objects to the Pension's claim against the Debtor based on the Guaranty, on the grounds that it is subject to mandatory subordination pursuant to

---

[21] Pension Ex. 16.

[22] Assignment Agreement, at §3.  The Pension's Default Notice requested of SAS-PB that "in light of the default, please advise if you will waive the thirty-day notice period."  Because the Assignment Agreement was entered into approximately two weeks later, evidently SAS-PB and the Debtor did agree to waive the 30-day grace period.

[23] Assignment Agreement, at Amended Annex A.

§510(b) of the Bankruptcy Code.  Section 510(b) provides as follows:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. §510(b).

The Third Circuit Court of Appeals has observed that §510(b) "represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy." *Baroda Hill Invs., Inc. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 141 (3d Cir. 2002).  The provision prevents disappointed shareholders from recovering their investment by asserting claims for damages on parity with general unsecured creditors.  *In re Alta+Cast, LLC*, 301 B.R. 150, 154 (Bankr. D. Del. 2003) (*citing Telegroup*).  Moreover, *Telegroup* holds that subordination under §510(b) is not limited to tort claims, but rather is broad enough to include breach of contract and related actions as well.  *Id.* at 143-144 (citing cases).  In order for a claim to be subordinated under §510(b), however, the claim must (a) involve a "security," (b) of the debtor or a debtor affiliate, and (c) "arise from" one of the three enumerated categories set forth in the subsection.  *NTP Marble, Inc. v. Papadopoulos (In re NTP Marble, Inc.)*, 491 B.R. 208, 212 (Bankr. E.D. Pa. 2013); *KIT Digital, Inc. v. Invigor Group Ltd. (In re KIT Digital, Inc.)*, 497 B.R. 170, 178 (Bankr. S.D.N.Y. 2013).

---

[24] Pension Ex. 17.

### A.    The Plan Administrator's Arguments for Subordination

The Plan Administrator's Claim Objection argues that the Pension Claim is based upon the Debtor's obligations under the Guaranty Agreement, and thus arises directly out of the Pension's purchase of a security in an affiliate of the Debtor.[25]

In arguing that §510(b)'s threshold requirement of the purchase or sale of a "security" is satisfied, the Plan Administrator cites to §101(49)(A)(xiii) of the Bankruptcy Code, which includes in the definition of security an "interest of a limited partner in a limited partnership." 11 U.S.C. §101(49)(xiii).  The Plan Administrator argues that "by its own admission" the Pension's purchase of the limited partnership interest in PB Spectrum Partners falls within the statutory definition.[26]

The Plan Administrator's argument as to how PB Spectrum Partners qualifies as an affiliate of the Debtor was somewhat of a moving target in its Pleadings and at the Hearing.  In its Claim Objection, the Plan Administrator first asserted that, as of the Petition Date, the Debtor held a 99.9% interest in PB Spectrum Partners.[27]  The Plan Administrator then contended that "For purposes of Section 510(b), the term 'affiliate' means an entity, 20% or more of whose outstanding voting securities are or were at [the] time creditor's claim arose, directly or indirectly owned or controlled by [a] Chapter 11 debtor, regardless of whether affiliate was owned or controlled by debtor when debtor filed bankruptcy."[28]  In so stating, the Plan

---

[25] Claim Objection, at ¶¶13, 20.

[26] Reply, at ¶¶39-40.  The Court is unclear as to what admission the Plan Administrator is referring, particularly in light of the fact that the Pension clearly contests the argument that its Investment was not in a security as defined by §101(49)(A).

[27] *Id.* at ¶14.

[28] *Id.* at ¶25.

Administrator cited §101(2) of the Bankruptcy Code generally, which defines the term

"affiliate," as well as *In re Wisconsin Barge Line, Inc.*, 76 B.R. 142, 144 (Bankr. E.D. Mo.

1987).

In its Response, the Pension argued that these statements are factually and legally

incorrect.  The Pension first contested the Plan Administrator's contention that the Debtor was a

limited partner in the Partnership as of the Petition Date, pointing to the Assignment prior to the

Petition Date.[29]  The Pension also argued that the Claim Objection misquoted §101(2)(B), on

which the Plan Administrator was evidently relying for its argument that the Partnership was an

affiliate of the Debtor, because the provision expressly applies to corporations, not broadly to

entities as asserted.[30]  That limited applicability, the Pension argued, rendered incorrect the Plan

Administrator's argument that PB Spectrum Partners, a limited partnership, was an affiliate of

the Debtor.[31]

The Plan Administrator then clarified its position in the Reply.  It conceded that the

Debtor had assigned its limited partnership interest in the Partnership as of the Petition Date, but

argued this fact was irrelevant to the analysis of affiliate status under §510(b) because, at the

time of the Investment, PB Spectrum Partners was an affiliate of the Debtor.[32]  The Plan

Administrator argues that there is no temporal limitation under §510(b), such that the relevant

time period for determining the affiliate status of the PB Spectrum Partners is at the time of the

---

[29] Response, at ¶¶16, 18-20.

[30] *Id.* at ¶¶25-26.

[31] Section 101(2)(B) provides affiliate status, subject to certain exceptions, to a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor."  11 U.S.C. §101(2)(B).

Investment.  With respect to <u>why</u> PB Spectrum Partners was an affiliate of the Debtor at the time

of the Investment, in its Reply the Plan Administrator revised its argument as to how §101(2)'s

definition of affiliate is satisfied.  Rather than §101(2)(B), the Plan Administrator relies on

§101(2)(C), which provides affiliate status to a "person whose business is operated under a lease

or operating agreement by a debtor, or person substantially all of whose property is operated

under an operating agreement with the debtor."  11 U.S.C. §101(2)(C).[33]

Additionally, the Plan Administrator also argues that the principle of "law of the case"

mandates subordination of the Pension Claim.  According to the Plan Administrator, this Court's

prior recharacterization and subordination of a claim (the "Carpenters Fund Claim") filed by the

Northeast Carpenters Annuity Fund (the "Carpenters Fund") should govern the Court's analysis

of the Pension Claim because "the matters at issue with respect to the [Pension Claim] are the

same matters already decided with respect to the [Carpenters Fund Claim]."[34]

B.    The Pension's Arguments Against Subordination

After having the benefit of the Plan Administrator's clarified arguments set forth in the

---

[32] Reply, at ¶3, fn. 1.

[33] At the Initial Hearing, in attempting to explain the argument set forth in the Claim Objection with respect to the affiliate relationship between the Debtor and the Partnership, the Plan Administrator's counsel stated that "we are taking a little bit of poetic license here," asserting that the Claim Objection only cited §101(2) generally and the *Wisconsin Barge* decision to support the Plan Administrator's argument that the affiliate status inquiry is governed both by the statute and caselaw holding that the relevant time period is the time of the purchase or sale of a security, not the date of the bankruptcy filing. Initial Hearing Audio Recording, at 12:13 to 12:15 p.m.  The Court does not believe there is room for "poetic license" when an objecting party is stating the grounds for objecting to a claim; rather, the objection should set forth the grounds for objection and the legal basis for doing so with sufficient clarity to permit the claimant to understand and respond to the asserted grounds for objection.  Here, paragraph 25 of the Claim Objection was, at best, unintentionally opaque, or, at worst, intentionally confusing.  The Plan Administrator's clarification or revision of its argument in the Reply then required additional time and briefing opportunity for the Pension, which would not have been necessary if the Claim Objection had been more clear in its presentation of the Plan Administrator's position.

Reply, the Pension makes a number of counter-arguments.  First, it argues that §510(b) is

inapplicable because the Pension did not purchase a "security" of PB Spectrum Partners.

Recognizing that the definition of security under §101(49)(A) of the Bankruptcy Code includes

an "interest of a limited partner in a limited partnership," the Pension argues that before and after

the Investment was made (until the Assignment occurred), the Debtor was the sole limited

partner of PB Spectrum Partners, with the Pension acquiring the sole Class PE Partner Interest.[35]

The Pension argues that its Class PE Partner Interest was neither a limited partner interest nor a

general partner interest, and therefore does not fall under §101(49)(A)(xiii) scope as an "interest

of a limited partner in a limited partnership."

The Pension next argues that neither clause of §101(2)(C) is satisfied to render PB

Spectrum Partners an affiliate of the Debtor.  According to the Pension, a threshold requirement

under §101(2)(C) is a contract between a debtor and a non-debtor to establish that the non-debtor

was an affiliate.[36]  Here, the Pension argues, SAS-PB had "exclusive responsibility" under the

LP Agreement for the management of the Partnership, and therefore the Partnership was not

"operated under a lease or operating agreement by a debtor," as required by the first clause of

§101(2)(C).[37]  The Pension also asserts that PB Spectrum Partners was not "operated under an

operating agreement with the debtor" as contemplated by the second clause of §101(2)(C)

because the Debtor was not a limited partner in or party to the Partnership's LP Agreement as of

---

[34] Claim Objection, at ¶33.

[35] Sur-Reply, at p. 3.

[36] *Id.* at p. 5.

[37] *Id.* at p. 6.

the Petition Date.[38]

Responding to the Plan Administrator's argument that the Court's prior recharacterization

and subordination of the Carpenters Fund Claim should be viewed as law of the case with respect

to the present Claim Objection, the Pension argues that the legal issue to be decided here differs

from that of the Carpenters Fund Claim because there the claim was based on the purchase of

shares in the Debtor, whereas here the claim is based on the Debtor's guaranty of the

Partnership's obligations under the LP Agreement.  The Pension argues that because the

Partnership was neither the Debtor nor an affiliate of the Debtor, the legal issue to be ruled on

here distinguishes it from the subordination ordered in the case of the Carpenters Fund Claim.[39]

Finally, the Pension argues, for the first time in its Sur-Reply, that its Investment is

outside the scope of §510(b) because it was nothing more than a secured loan, providing for a

guaranteed return of 12% and a promised four-year redemption date, and therefore does not

"arise from" the purchase of a security of the Debtor or an affiliate of the Debtor.[40]  The Pension

argues that the Investment provided the Pension with no special rights of equity, but rather only

the rights of a secured creditor, permitting it to demand the Pledged Interests upon the

Partnership's default under the LP Agreement, only then becoming a limited partner.[41]  The

Pension therefore asserts that the Pension Claim under the Guaranty is not a claim based on

equity or some expectation interest in interests of the Debtor or the Partnership, but is instead a

---

[38] *Id.*

[39] Response, at ¶¶36-40.

[40] *Id.* at p. 9.

[41] *Id.*

claim for simple recovery of an unpaid debt due upon an instrument.[42]

## C.   Analysis

In analyzing the Parties' competing legal arguments as to the applicability of mandatory subordination under §510(b), the Court will first dispense with two arguments made which the Court believes lack merit: (a) the Plan Administrator's argument that law of the case governs the analysis and resolution of the Claim Objection; and (b) the Pension's argument that the Pension Claim does not arise from the purchase of a security because the Investment was actually a loan. The Court will then turn to the threshold issue of whether the Investment was made for a "security" as defined by the Bankruptcy Code.  *See Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 855 F.3d 459, 472 (2d Cir. 2017) (whether "security" as that term is defined under §101(49) of the Bankruptcy Code is satisfied lies at the threshold of the inquiry as to whether subordination under §510(b) is appropriate).  Because the Court answers that inquiry in the negative, it is unnecessary to determine whether the Partnership was an affiliate of the Debtor under §101(2)(C) of the Bankruptcy Code, whether at the time of the Investment or at the time of the Petition.

### 1.   The Doctrine of Law of the Case Is Not Applicable to the Claim Objection

The Plan Administrator argues that the doctrine of "law of the case" should govern the outcome of the Claim Objection because the Court previously recharacterized the Carpenters Fund Claim as a proof of interest based on an equity investment in the Debtor and subordinated it pursuant to §510(b).  The Carpenters Fund Claim was based on an investment the Carpenters Fund made by purchasing $5,000,000 of Class A shares in the Debtor, thereby becoming a

---

[42] *Id.*

limited partner.[43]  The Carpenters Fund's investment was backed by a guaranty agreement that

made the Debtor's general partner a surety for the redemption of the investment upon the

Carpenter Fund's demand.[44]  The Carpenters Fund subsequently made a redemption demand that

was not honored prior to the Debtor filing for bankruptcy, and the Carpenters Fund filed the

Carpenters Fund Claim based on the redemption of its investment plus interest.[45]  This Court

recharacterized the claim as a proof of interest subject to subordination under §510(b).[46]  That

decision was upheld on appeal to the District Court.[47]

The doctrine of the law of the case dictates that when a court decides upon a rule of law,

that rule should continue to govern the same issues in subsequent stages of the case.  *See, e.g.,*

*Resyn Corp. v. U.S. (In re Resyn Corp.)*, 94 F.2d 1279 (3d Cir. 1991).  While the Carpenters

Fund Claim and the Pension Claim share certain similarities, the subordination of the former did

not entail the same legal issues that will determine the Claim Objection.  The Debtor's request to

subordinate the Carpenters Fund Claim did not require the Court to resolve competing arguments

as to whether the Carpenter Fund purchased a "security" as defined by §101(49) of the

Bankruptcy Code, because it was not contested that the Carpenters Fund purchased shares in the

Debtor and became a limited partner thereof, which satisfies the statutory definition pursuant to

§101(49)(xiii).  *See Ne. Carpenters Annuity Fund v. Spectrum All. LP (In re Spectrum Alliance,*

*LP)*, 609 B.R. 11, 24 (E.D. Pa. 2019) (finding that the "security" element was met for

---

[43] Plan Administrator Ex. 4.

[44] *Id.*

[45] Pension Ex. 21, at §II.

[46] Pension Ex. 20.

[47] Pension Ex. 21.

subordination to apply because the Carpenters Fund purchased Class A Shares in the Debtor,

"thus becoming a Class A limited partner in Spectrum, which is a limited partnership.")  Nor was

there an issue as to whether the securities purchased were those of the Debtor or an affiliate of

the Debtor, as there is in the present case.[48]  For the doctrine of law of the case to apply, "the

issue in question must have been decided explicitly or by necessary implication in the previous

disposition."  *U.S. v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) (internal quotation and citations

omitted).  The Court's resolution of the Claim Objection requires resolution of legal issues not

addressed in the prior subordination of the Carpenters Fund Claim, and therefore the doctrine of

law of the case does not dictate the result here.

### 2.    The Investment Was an Equity Investment, not a Loan

The Court next addresses the Pension's argument that the Investment was nothing more

than a secured loan to the Partnership, and therefore the Pension Claim based on the Debtor's

Guaranty does not arise from the purchase or sale of a security of the Debtor or its affiliate.

It is true that the LP Agreement provided the Pension a guaranteed return on its

Investment: Quarterly Payments equal to 12% per annum, with Redemption in four years or less.

It is also true that the Partnership's payment obligations were secured both by the Pledged

Interests and the Guaranty.  These facts are not enough, however, to characterize the Investment

as a loan where other indications point to an equity investment.  *See O'Cheskey v. Templeton (In*

---

[48] The Court finds off-base the Plan Administrator's argument that the Carpenter Fund's investment in the Debtor and the Pension's investment in PB Spectrum Partners is a "distinction without a difference" because Section 510(b) applies equally to claims for damages arising from the purchase or sale of a security of a <u>debtor</u> and to the purchase and sale of a security of <u>an affiliate of a debtor</u>.  Reply, at ¶¶65-66 (emphasis in original).  The Pension is not arguing that the statute does not apply in both circumstances. Rather, the Pension is arguing that neither circumstance is present here, unlike in the case of the Carpenters Fund Claim, thereby rendering the law of the case doctrine inapplicable.

*re Am. Hous. Found.)*, 2013 Bankr. LEXIS 1449 (Bankr. N.D. Tex. Mar. 30, 2013), *aff'd in part,*

*rev'd in part on other grounds*, 785 F.3d 143 (5th Cir. 2015) (looking to Texas law to

recharacterize and subordinate purported debt as equity, notwithstanding that¸ *inter alia*, the

deals at issue provided for a guaranteed rate of return and redemption rights, because other

factors supported characterization as equity).

The LP Agreement, to which the Pension was a party, (a) provided for the creation of the

Class PE Partner Interest and the admission of the Pension as the Class PE Partner, (b) referred

to the Investment as a capital contribution rather than a loan, (c) referred to the 12% Quarterly

Payments as the Pension's preferred return, rather than interest, and (d) restricted the Pension's

ability, as a Partner, to transfer its Partnership Interest except in compliance with the Securities

Act of 1933 and the terms of the LP Agreement.  Anecdotally, but consistent with the LP

Agreement, the Guaranty Agreement refers to the Investment as a preferred equity investment

and refers to the Quarterly Payments as a return on payments, rather than interest.  Additionally,

Annex A to the LP Agreement lists the Pension's $10,000,000 Investment as its capital

contribution, not as a loan.

Moreover, the Pension has characterized the Investment as an equity investment in these

bankruptcy proceedings and in state court.  In the Pension Claim itself, filed in 2017, the Pension

characterizes the Investment as a "Guaranteed Investment," rather than a loan, and refers to the

Quarterly Payments as its "Class PE Partner Preferred Return," rather than interest.[49]  In its 2018

Complaint in the Pennsylvania Court of Common Pleas against Robert T. Wrigley (the "State

Court Complaint"), asserting a breach of contract claim against him based on his guaranty of the

---

[49] Pension Ex. 2, at Addendum.

Partnership's payment obligations under the LP Agreement, the Pension characterized the

Investment as a "$10,000,000.00 equity investment in [PB Spectrum Partners] … in exchange

for, among other things, a preferred partnership interest in the Partnership."[50]  The State Court

Complaint also refers to the Quarterly Payments as a preferred return, rather than interest

payments, and the Redemption of the Class PE Partner Interest, rather than the payment of

principal.

     The characterization of the Investment in the LP Agreement and the Guaranty, as well as

the Pension's own representations in the Pension Claim and the State Court Complaint, evidence

that prior to filing its Sur-Reply, the Pension understood the Investment to be an equity

investment, not a loan.  The Court therefore rejects the Pension's new-found argument in the

Sur-Reply that the Pension Claim does not arise from the purchase of a security because the

Investment was a loan.[51]

### 3.    The Investment Was Not the Purchase of a "Security" Under §101(49)(A) of the Bankruptcy Code

     As noted *supra*, the Plan Administrator argues that the Investment was the purchase of a

security for purposes of §510(b) because the Pension received, in exchange for $10,000,000, an

"interest of a limited partner in a limited partnership," which is included in §101(49)(A)'s

definition of security.  11 U.S.C. §101(49)(A)(xiii).  The Pension, on the other hand, argues that

it did not acquire an interest of a limited partner in a limited partnership because, both before and

---

[50] Pension Ex. 15, at ¶6.

[51] The Court also observes that, in its Response, the Pension did not argue that the Investment was a
secured loan.  The Pension's conviction in this argument would have been better evidenced by its
inclusion among the primary arguments in the Response for why subordination is not appropriate under
§510(b).  More importantly, however, the Court believes the Pension's intent to treat the Investment as an
equity investment is evidenced by the LP Agreement and the Guaranty.

after the Investment (until the Assignment), the Debtor was the sole limited partner of PB
Spectrum Partners.  The Pension argues it was admitted to the Partnership merely as a Class PE
Partner, and only became a limited partner upon the Assignment of the Debtor's interest in the
Partnership one week before the Petition Date.  To determine the nature of the interest the
Pension acquired in exchange for the Investment and the type of partner it was in the Partnership,
the Court looks to the terms of the LP Agreement, which was the operative agreement by which
the Pension was admitted as a Partner and acquired its Partnership Interest.  *See LaBrum & Doak
v. Bechtle (In re LaBrum & Doak, LLP)*, 222 B.R. 749, 756-57 (Bankr. E.D. Pa. 1998) (a written
partnership agreement setting out the terms of the partnership and the duties and privileges of the
parties is a contract and must therefore be interpreted in accordance with state contract law).

### a. Section 101(49)(A)(xiii) Is Not Satisfied Because the Class PE Partner Was Not a Limited Partner in the Partnership

The LP Agreement's introductory paragraph states that it is executed by SAS-BP, as the
sole general partner of the Partnership, the Debtor, as the sole limited partner of the Partnership,
and the Pension.  Confusingly, the Pension is assigned the defined term "Class PE Partner," but
is also included in the defined term "Limited Partners" with the Debtor.  The reference to the
Debtor as the "sole limited partner" is at odds with the inclusion of the Pension in the defined
term of "Limited Partners," but consistent with the distinct rights each had, or didn't have, as
discussed *infra*.[52]  The paragraph therefore does not shed very helpful light on the nature of the
partnership interest the Pension acquired or the type of partner it became in the Partnership.

The LP Agreement's recitals go on to state that the Partners, which are defined to mean

---

[52] It may be that referencing the Debtor as the sole limited partner was intended to reflect the situation as
it existed just prior to the parties entering into the LP Agreement, but that is not expressed anywhere in

SAS-PB, the Debtor, and the Pension, "desire to amend and restate the Original LP Agreement

(i) to provide for the creation of a Class PE Partner Interest and the admission of the Class PE

Partner *as a Limited Partner* holding a Class PE Partner Interest."  (emphasis added).  This is

evidence of the stated *intention* of the Debtor, the Pension, and SAS-PB to admit the Pension as

a limited partner, but the actual terms of the LP Agreement determine whether they in fact did

so.

Whether or not such interest rendered the Pension a limited partner, the Parties do not

dispute that the Pension acquired a Class PE Partner Interest, which is defined by the LP

Agreement to mean "the Partnership Interest issued to and held by the Class PE Partner pursuant

to Section 3.01 and as set forth on Annex A."[53]  Therefore the nature of the Class PE Partner

Interest is spelled out in §3.01 and Annex A, and the Court looks to them to determine the

interest the Pension received.

Section 3.01(b)[54] of the LP Agreement provides that "As of the Effective Date, in

exchange for a capital contribution of $10,000,000, the Partnership hereby issues *the Class PE*

*Partner Interest* to the Class PE Partner, and the Class PE Partner is hereby admitted as *a*

*Partner* of the Partnership holding the Class PE Partner Interest.  *The Class PE Partner shall*

*have only those rights, benefits and obligations specifically ascribed* to the Class PE Partner in

this Agreement.  Following the Redemption of the Class PE Partner Interest, the Class PE

---

the agreement.

[53] LP Agreement, at §1.01.

[54] Section 3.01(a) provides that a Person who acquires a previously outstanding Partnership Interest in accordance with the LP Agreement shall be automatically admitted as a Partner, and other Persons may be admitted as Partners from time to time.  The provision is not relevant to the nature of the Pension's partnership interest.

Partner shall be automatically withdrawn from the Partnership without the need for any further action or documentation." (emphasis added). The plain language of §3.01(b) thus admits the Pension generally as a <u>Partner</u>, not specifically as a limited partner, and expressly states that, as the Class PE Partner, the Pension will have only those rights <u>specifically ascribed</u> to it.

Section 3.01(c) states merely that Annex A sets forth the name, mailing address, Capital Contribution, Agreed Value (if applicable) and Percentage Interest of each Partner. Annex A, in turn, sets forth three categories of Partners and their respective Percentage Interest[55] in the Partnership: (i) the General Partner (SAS-PB), with a 0.1% interest, (ii) the Limited Partner (the Debtor), with a 99.9% interest, and (iii) the Class PE Partner (the Pension), with a 0% interest, subject to its rights under §§4.06, 4.12, 5.01, 5.03 and 9.04 of the LP Agreement. Annex A therefore, by separately classifying the Limited Partner and the Class PE Partner, suggests a distinction exists between the Limited Partner and the Class PE Partner. That suggestion is borne out by other terms of the LP Agreement.

The first distinction is the Pension's priority to distribution of Available Cash over the General Partner and Limited Partner, as discussed *supra*. However, as the Class PE Partner, the Pension also had a different bundle of rights than did the Debtor as a limited partner. For example, §5.01(a) vested the General Partner with the exclusive responsibility to manage the business of the Partnership but prohibited certain actions without first obtaining consent from the Class PE Partner. No such consent power was given to the Debtor as Limited Partner with respect to those actions. By contrast, §6.01's provision for the voting rights of the Partners hinged each Partner's voting power on their respective Percentage Interest. Per Annex A to the

---

[55] The term "Percentage Interest" is defined to mean the "proportionate Partnership Interest of a Partner

LP Agreement, the Class PE Partner's Percentage Interest was 0%, and therefore the Class PE

Partner had no voting rights under §6.01.[56]  Furthermore, because the Class PE Partner had no

voting rights, its presence or absence had no bearing on whether a quorum was established for a

meeting of the Partners, which was calculated based on the presence of "Partners entitled to cast

at least a majority of the votes that all Partners are entitled to cast on a particular matter to be

acted upon…."  LP Agreement, at §6.03(a).  Together, §§6.01 and 6.03 meant that the Pension

was not entitled to vote and its presence at meetings where a vote would be required was not

even necessary.  This total lack of official voice in almost all Partnership actions is a significant

difference between the Class PE Partner and the Limited Partner.

The express grant of a Class PE Partner Interest under §3.01(b) of the LP Agreement, that

included only those rights specifically ascribed to it in the LP Agreement, the distinction made

between the Class PE Partner and the Limited Partner in Annex A (including the Class PE

Partner's lack of a Percentage Interest in the Partnership), and the distinct rights the Class PE

Partner had under the LP Agreement in some respects, and lack of rights in other respects,

indicate to the Court that the Class PE Partner neither acquired a limited partnership interest by

its Investment in PB Spectrum Partners nor was a limited partner under the LP Agreement.

Notwithstanding the Partners' apparent intention to admit the Pension as a limited partner, as

expressed in the third Recital paragraph of the LP Agreement, that intention does not rule the

day.[57]  While the Pension certainly acquired a partnership interest in a limited partnership, that

---

expressed as a percentage, as shown on <u>Annex A</u>."

[56] Amendment of the LP Agreement to change the rights of the Class PE Partner, however, required the
Class PE Partner's written consent.  LP Agreement, at §9.04.

[57] Nor does the statement in the Whereas paragraphs of the Assignment Agreement, cited by the Plan
Administrator at the Continued Hearing, that "Class PE Partner contributed $10,000,000 to the

interest was a Class PE Partner Interest, as opposed to a limited partnership interest, and nothing

else in the LP Agreement conferred upon the Pension the status or rights of a limited partner.[58]

To the contrary, the LP Agreement made certain critical distinctions between the Class PE

Partner's rights and the Limited Partner's rights, and nowhere does it expressly provide that

notwithstanding those distinctions, both are limited partners.  Particularly where the admission of

the Pension as a Class PE Partner under §3.01(b) came with the reservation that it would have

only those rights specifically ascribed to it; the terms of the LP Agreement simply do not support

a finding that the Pension purchased an "interest of a limited partner in a limited partnership"

under §101(49)(A)(xiii).

### b.    The Investment Was Not the Purchase of a "Security" Under §101(49)(A)(xiv)'s Broad Residual Clause Either

At the Continued Hearing, the Plan Administrator's counsel correctly noted that the

enumerated interests in §101(49)(A)'s definition of security are not exclusive[59] – the definition

begins "The term 'security' (A) includes …," before enumerating various types of specific

interests that qualify as securities.  Counsel did not, however, suggest how the Investment would

otherwise satisfy the statutory definition of security if it was not the purchase of an interest of a

---

Partnership and was admitted as a limited partner with a Class PE Partner Interest in the Partnership."
Continued Hearing Audio Recording, at 12:40 to 12:41.  Where the terms of the LP Agreement, which is
the operative document effectuating the admission of the Pension as a Partner, do not reflect its admission
as a limited partner, a contradictory background paragraph in the Assignment Agreement entered into
approximately 18 months later does not alter or amend the true nature of the Pension's Partner status.

[58] The Court agrees with the Plan Administrator's argument at the Continued Hearing that
§101(49)(A)(xiii) does not require a *limited partnership interest* in a limited partnership, but rather
requires only an interest *of a limited partner* in a limited partnership.  Continued Hearing Audio
Recording, at 12:41 to 12:42 p.m.  That distinction is important, and in other circumstances could support
a finding that §101(49)(A)(xiii) is met.  That is not the case here, however, as the LP Agreement clearly
contemplated a distinction between the Class PE Partner and the Limited Partner.

[59] Continued Hearing Audio Recording, at 12:39 p.m.

limited partner in a limited partnership. Nonetheless, an outlier exists among the specific

interests listed in §101(49)(A); included among them is any "other claim or interest commonly

known as 'security'." 11 U.S.C. §101(49)(A)(xiv). As such, the interests specifically

enumerated in §101(49)(A) do not exhaust the universe of securities within the meaning of the

Bankruptcy Code, and the residual clause in subsection (A)(xiv) "opens the door to securities not

specifically listed." *Lehman Brothers*, 855 F.3d at 473; *see also Seaquest Diving, LP v. S&J

Diving, Inc. (In the Matter of Seaquest Diving, LP)*, 579 F.3d 411, 418 (5th Cir. 2009) (referring

to §101(49)(A)(xiv) as "the broad residual category"); *Templeton*, 2013 Bankr. LEXIS 1449, at

*51 (the list in §101(49)(A) is not exclusive).

The *Lehman Brothers* court, in finding that the restricted stock units at issue in that case

were securities subject to mandatory subordination, found that they had "many of the hallmark

characteristics" of a security: (a) the holders had limited voting rights, (b) they received declared

dividends in the form of additional restricted stock units, and (c) "of most significance, they had

the same risk and benefit expectations as shareholders because the value of their [restricted stock

units] was tied to the value of the debtor's common stock." *Id.* at 474. In so finding, the court

looked to other decisions that had "similarly defined 'security' in §510(b) in terms of an interest

tied to a firm's overall success." *Id.* (collecting cases).

Likewise, securities' inherent characteristic of the holder sharing in the "upside" of a

business led the court in *O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza

Props., LLC)*, 488 B.R. 394 (B.A.P. 9th Cir. 2013), also relying on the residual category for

securities, to find that the interest of a member in a limited liability company is a security based

on its similarity to the interest of a limited partner in a limited partnership: "The similarities

between the interest of a limited partner in a limited partnership and a membership interest in an

LLC are substantial.  For example, each owns an interest in the enterprise and shares in net

revenues and increases in value, and those who extend credit to the enterprise do so in the

expectation that their claims will be paid before any distribution to limited partners or LLC

members.  It follows that, if the interest of a limited partner in a limited partnership is a 'security'

under the Bankruptcy Code, then the interest of a member in an LLC is also a 'security' for

purposes of the Bankruptcy Code." *Id.* at 399.

Other courts evaluating §101(49)(A)(xiv) have also focused on the risk/reward nature of

securities, in whatever form they may take.  *See, e.g., French v. Linn Energy. L.L.C. (In re Linn*

*Energy, LLC)*, 936 F.3d 334, 343 (5th Cir. 2019) (finding that deemed dividend payments should

be treated as securities subject to subordination under the broad residual clause because the

upside of the dividend payments was theoretically limitless, as it tracked the value of the

corporation, but they also carried the risk of paying nothing if the corporation went bankrupt or

declined to issue dividends); *Templeton*, 2013 Bankr. LEXIS 1449, at *51 (finding the

investments at issue gave the investor "unlimited upside potential" and therefore fit within the

broad residual category even if they did not match any of the "labels" set forth in the definition);

*In re Worldcom, Inc.*, 358 B.R. 585 (Bankr. S.D.N.Y. Dec. 21, 2006) ("The form in which the

equity interest is held is ultimately irrelevant.  So long as the claimant's interest enabled him to

participate in the success of the enterprise and the distribution of profits, the claim will be

subordinated pursuant to section 510(b).").

Here, the Pension did not, by its acquisition of the Class PE Partner Interest, obtain the

right to share in the success of the Partnership or the distribution of any profits.  First, under the

LP Agreement, the calculation of "Profits and Losses" expressly excludes "any items that are specially allocated to certain Partners, including but not limited to, a Class PE Partner."[60]  As such, the Quarterly Payments and the Redemption of the Investment allocated to the Class PE Partner under §4.06 of the LP Agreement were "taken off the top" and did not constitute a distribution of Profits to the Class PE Partner.  Moreover, §4.05 of the LP Agreement provides that "Profits and Losses" shall be allocated to the Partners as provided in Annex B.  In turn, §B.3 of Annex B provides, in relevant part, that "After giving effect to the special allocations set forth in Sections B.5 and B.6, Profits for any taxable year shall be allocated to the Partners in proportion to their Percentage Interests…."[61]  Likewise, Losses were allocated to the Partners in proportion to their Percentage Interests.[62]  As discussed above, the Pension did not have a Percentage Interest in the Partnership under the LP Agreement, and therefore had no right under Annex B to share in the Profits and Losses of the Partnership.

Where the key indicator courts have looked to, in determining whether a particular interest constitutes a security under the broad residual clause of §101(49)(A)(xiv), is whether the interest-holder "shares the same risk and benefit expectations as shareholders," the Class PE Partner Interest does not meet the test.  Under the LP Agreement, the Class PE Partner did not have the right or expectation to share in the Profits of the Partnership and was not exposed to its Losses in the same way as the other Partners.  With this key feature of a security missing, the Class PE Partner Interest was not a security as contemplated by §101(49)(A)(xiv)'s residual provision, and the Investment was not the purchase of a security of the Debtor or its affiliate as

---

[60] LP Agreement, at §1.01.

[61] LP Agreement, at Annex B §B.3.

contemplated under §510(b), notwithstanding its broad application.

Having found that the Investment did not constitute the purchase of a security as defined by §101(49) of the Bankruptcy Code, it follows that the Pension Claim, based on the Debtor's Guaranty of the Partnership's obligations with respect to the Investment, does not arise from the purchase of a security in the Debtor or its affiliate under §510(b). Therefore subordination under that section is not appropriate, and the Court need not determine whether PB Spectrum Partners was an affiliate of the Debtor under §101(2)(C).

## V.    CONCLUSION

For the reasons discussed above, the Court will overrule the Claim Objection. An Order consistent with this Memorandum will be entered.

Dated:  January 21, 2022

_Magdeline D. Coleman_
_____
MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

Albert A. Ciardi, III, Esquire
Jennifer C. McEntee, Esquire
Ciardi Ciardi & Astin, P.C.
One Commerce Square
2005 Market Street, Suite 3500
Philadelphia, PA 19103

Lawrence J. Kotler, Esquire
Drew S. McGehrin, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103-4196

George M. Conway, Esquire
United States Trustee
Custom House
200 Chestnut Street, Suite 502
Philadelphia, PA 19106

---

[62] _Id._ at §B.4.